REUBEN N. DAY ET AL. *v.* JAMES M. SMITH ET AL.

[39 South. Rep., 526.]

1. JUDICIAL NOTICE. *Historical facts.*

Courts take judicial notice of the fact that the country was in a state of actual war in 1861, and that Mississippi then had a *de facto* state government, with *de facto* officers, necessarily compelled to execute the mandates of the government then in power.

2. TAXATION. *Illegality. Confederate taxes.*

Taxes levied in support of the confederate state government by the state of Mississippi for the years 1861 and 1862, although illegal, were levied by a *de facto* government, and cannot be treated as never having been paid, because of such illegality, in support of a sale of land for taxes, requiring a payment by the purchaser of the taxes for such years.

3. SAME. *Code* 1857.

Under Code 1857, art. 39, p. 80 (*Ib.*, art. 43, p. 82), where lands were sold for taxes and struck off to an individual, he did not receive a deed for two years, and not then without paying the taxes of the intervening years; hence where land was sold for the taxes of 1860, the deed to which was delivered to the purchaser in May, 1863, upon payment of the taxes of 1861 and 1862, including war taxes, the purchaser did not acquire title, because a part of the taxes paid by him were levied in aid of the confederate states.

4. SAME. *Evidence. Official acts. Presumptions.*

Where a purchaser of land sold for the taxes of 1860 obtained his deed therefor, it will be presumed on demurrer, in the absence of a charge to the contrary, that the clerk collected and the purchaser paid the void taxes of 1861 and 1862, assessed by the state largely for the benefit of the confederacy, since the clerk was required to do so by statute. Code 1857, arts. 39, 43, pp. 80, 83.

FROM the chancery court of Scott county.

HON. JAMES L. McCASKILL, Chancellor.

Day and others, the appellants, were complainants in the court below; Smith and others, the appellees, were defendants there.

The object of the suit was to remove clouds from the title to real estate.

The appellants, the complainants in the court below, alleged in their bill that they were and are the rightful owners of the land in controversy and deraign their title from one Jeffcoat, who acquired the land in 1889 from the state of Mississippi, the land having been sold to the state in 1876 for the taxes of 1875.

One James F. Smith patented the land from the United States government in 1836. In May, 1861, while the state of Mississippi was in open rebellion against the government of the United States, the land was sold for the taxes of 1860 by the tax collector of Scott county, Mississippi, and purchased by one A. B. Smith. The heirs of the patentee, James F. Smith, and the heirs of the tax purchaser, A. B. Smith, and their vendees, were made defendants to the suit. Some of the defendants—Mrs. Elizabeth F. Graham, Mrs. Beatrice F. Oatis, and Samuel H. Kirkland—answered the bill and made their answer a cross-bill, praying cancellation of complainants' assertion of title as a cloud on their title to the land in dispute.

The complainants demurred to the cross-bill, assigning amongst other grounds the fact that the state of Mississippi in 1861—the time of the tax sale to A. B. Smith—was engaged in levying war against the United States, and the tax sale was therefore void, and that it was void as having been made in aid of the rebellion.

The demurrer was overruled, and complainants appealed to the supreme court.

[This case was once before in the supreme court, and a decision then made is reported—*Day* v. *Oatis,* 85 Miss., 128.]

*Green & Green, Ricketts & Peyton,* and *Jeff Kent,* for appellants.

The tax deed is void because, to obtain it, it was necessary to pay war taxes to the state in aid of the war against the lawful authority of the United States.

It is provided by Code 1857, ch. 3, art. 39, p. 80:

"The collector shall file all deeds for land sold to the state, or other persons, in the office of the clerk of the probate court of the county, on or before the second Monday of May, there to remain for two years from the date of the sale unless sooner redeemed; and the owner of such land, or any person for him, may redeem the same within two years by paying to the said probate clerk the whole amount of tax for which such land was sold, with all costs and charges consequent upon said sale, and fifty per centum damages upon the amount of said tax and costs, and also all state and county taxes that have accrued on said land since said sale, and also five per centum on the whole amount of such redemption for the compensation of the said clerk for making the same," etc.

By Code 1857, ch. 3, art. 43, p. 82, it is provided:

"When any land shall have been sold for taxes and purchased by any person other than the state, the taxes thereon for all succeeding years until the same shall have been redeemed shall be charged by the collector to such purchaser or his assigns, and collected of him or them in like manner as other taxes due by him or them, and such land shall be liable to be sold for the taxes of such purchaser or his assigns, and if sold for the taxes of such purchaser or his assigns, and not redeemed by him or them, the persons as whose property it was assessed shall be entitled to redeem the same from the second purchaser, on payment only of the amount due in such second sale."

From these two sections it is perfectly apparent that when Smith paid out fifty dollars for ten thousand acres of land on May 6, 1861, the deed therefor was deposited with the clerk of the probate court, there to remain until May 6, 1863, and it is further manifest that to obtain the deed thereto it was essential that Smith should pay the taxes accruing thereon in the years 1861 and 1862. Under the express terms of the statute, taxes for these several years were charged against him, and the pay-

ment thereof was a condition precedent to his ever obtaining a deed.

The period of redemption must have expired and the owner failed to redeem before Smith could have become entitled to the deed conveying the land. But the taxes of 1861 and the taxes of 1862, which must have been paid by Smith, were composed of many illegal elements—taxes levied in direct aid of the civil war then being carried on against the lawful authority of the United States. *Shattuck* v. *Daniel*, 52 Miss., 836.

These proceedings being utterly void, the land remained to the original owner unaffected by the sale. It continued to be subject to assessment as his property. *Dogan* v. *Griffin*, 51 Miss., 782; *Beard* v. *Green*, 51 Miss., 856. To obtain the deed in question, Smith paid the taxes of 1861 and the taxes of 1862, as he was required to do by the statutory law in force at the time, and in making these payments he directly contributed money in aid of the war by the payment of unlawful war taxes. His act in so doing was illegal—absolutely unlawful. It was, in law, a contribution to carry on an illegal war, and such payment rendered the transaction in which it was made void. *Railroad Co.* v. *State*, 46 Miss., 157; *Railroad Co.* v. *State*, 52 Miss., 878; *Texas* v. *White*, 7 Wall., 732.

It was absolutely beyond the power of the probate clerk to accept anything but the whole, because he was an officer of those then in authority, deriving his rights, if any, from the confederate authority then established and which had dominion over the state; and this officer could not, and most assuredly would not, have accepted the tender of anything less than the total amount of taxes, both legal and illegal. It was his duty to his principal to do so; it was beyond his power to do otherwise. As wisely said in Brown's Legal Maxims (7th ed.): "It is a maxim of our legal authors, as well as a dictate of common sense, that the law will not itself attempt to do an act which would be vain—*lex nil frustra facit;* nor to enforce one which would be frivolous—*lex*

*nominem cogit ad vana sueinutilia.* The law will not, in the language of the old reports, force any one to do a thing which will be vain and fruitless."

In the instant case the positive mandate of the law of the government to which the clerk was in fact subservient forbade any other course, and to suggest such a course would have been a breach of official duties. The very money that was lawful in the United States was illegal in making these redemptions, and was not available, and the money which would have had to be made use of in paying these taxes was itself unlawful under the laws of the United States.

*Amis & Dunn,* for appellees.

The tax sale in this case was made on the first Monday in May, 1861, for delinquent taxes for the fiscal year 1860, and a deed was duly executed and delivered, pursuant to said sale. By the act of February 10, 1860, this deed was *prima facie* evidence of title in the tax purchaser. In *Sigman* v. *Lundy,* 66 Miss., 522, this court, construing that act, says:

"The act was to provide for the better security of tax titles. It affords a remedy by which the holder under tax title might call into court all persons claiming or having any interest in such land which existed at the time the same was sold for taxes, and settle once for all the validity of his title. As to the sales thereafter to be made, it adds the assurance that after the lapse of five years no hostile claim could be asserted; whether the purchaser at tax sale or the former owner was in possession of the land or whether the land was occupied or vacant, the security afforded by the act existed. The provision as to future sales was intended to be, and was, an irrepealable and irrevocable stipulation that, after the lapse of time named, no assailment of the title should be made. It was, and was intended to be, a part of the contract into which the purchaser would enter—an inherent, continuing

element of right secured, running with the land, and a perpetual security of the title."

To the same effect, see *Nevin* v. *Bailey,* 62 Miss., 433; *Dingey* v. *Paxton,* 60 Miss., 1038; *Carlysle* v. *Yoder,* 69 Miss., 384 (s.c., 12 South. Rep., 255); *Gibson* v. *Berry,* 66 Miss., 515 (s.c., 6 South. Rep., 325); *Jonas* v. *Flanniken,* 69 Miss., 577 (s.c., 11 South. Rep., 319); *Cole* v. *Coon,* 70 Miss., 634 (s.c., 12 South. Rep., 849).

We therefore contend that the deed in question is *prima facie* evidence of title in A. B. Smith, the tax purchaser, to the extent that the mere introduction of the deed in evidence is *prima facie* proof that the levy, assessment, and sale, and all steps precedent thereto, were legal and valid. We, of course, understand that it is only *prima facie* of these facts, and that this presumption may be overcome by actual proof on the hearing of the case, or by facts of which the court itself will take judicial notice. We understand that, if the assessment had been made under an unconstitutional act of the legislature, or if the levy of the tax was unlawful, or if any other matter or thing existed at the time of or prior to the tax sale, which was of such nature as that the court would take judicial notice of it, which would injuriously affect the validity of the tax sale, then it would be proper for the court to consider such matter on demurrer to the bill, without the necessity of proof of such matter.

In the present case, however, there is no act or thing, of which the court will take judicial notice, that would in any way affect injuriously the validity of the tax sale made on the first Monday in May, 1861, unless it be the ordinance of secession passed by the secession convention in December, 1860.

The assessment of lands for the year 1860 was made under and by virtue of the provisions of Code 1857, ch. 3, § 5, and was, in all respects, legal and valid. The land tax for the fiscal year 1860, for the collection of which the tax sale on the first Monday in May, 1861, was had, was levied by the legislature by the act

of February 11, 1860.   See Acts 1859-1860, p. 201.   In this land tax there was no illegal element whatever.   The first revenue act in aid of the rebellion was the act of August 2, 1861. See Acts 1861, pp. 31, 32.   The next revenue act in aid of the rebellion was the act of December 16, 1861.   See Acts 1861, p. 53.   The fiscal year 1860 had expired long before any revenue act in aid of the rebellion was passed.   It must be, therefore, true that the levy and assessment were lawful, at least so far as concerns any matter of which the court will take judicial notice. The only thing, of which the court will take judicial notice, that might injuriously affect the validity of the tax sale had on the first Monday in May, 1861, is, therefore, the ordinance of secession, adopted by the secession convention in December, 1860. In other words, did Rogers as sheriff and tax collector of Scott county have any lawful authority on the first Monday in May, 1861, to sell the lands in his county which were delinquent for the taxes of the fiscal year 1860 ?

The ordinance of secession passed by the secession convention in December, 1860, was an unlawful act, and could not and did not in any wise affect the status of the state of Mississippi. While it pretended and attempted to withdraw the state of Mississippi from the federal union, it did not have any such effect.   The state of Mississippi has been a member of the federal union since it was admitted, and the ordinance of secession did not have the effect to withdraw it or put it out of the federal union.   It was a void act, because it was unlawful.   It makes no difference what the members of the secession convention thought about the validity of this ordinance or what they thought would be the end of the matter; the fact still remains that it was unlawful, because it was subversive of the compact between the state of Mississippi and the other members of the federal union.   It was unlawful in its inception and could never become lawful unless, by the stern arbitrament of war, the act which in its inception was unlawful had been made lawful by the power of the sword;

and since this was never done, the ordinance of secession was always unlawful. See *Whit* v. *Hart,* 13 Wall., 646; *Texas* v. *White,* 7 Wall., 700; *Williams* v. *Bruffy,* 96 U. S., 176; *Keith* v. *Clarke,* 97 U. S., 454; *While* v. *Cannon,* 6 Wall., 443; *Ketchum* v. *Buckley,* 99 U. S., 188; *Sprott* v. *United States,* 20 Wall., 459.

But counsel for appellants contend that even admitting that the tax sale and all steps precedent thereto were lawful, still the title to the land purchased by Smith at such tax sale never vested in him, because it was a condition precedent to the vesting of such title in him (1) that the owner of the land should not redeem it, and (2) that he, the tax purchaser, should pay the taxes on said land so purchased by him for the fiscal years 1861 and 1862, and that because these taxes for the fiscal years 1861 and 1862 were unlawful, as being in aid of rebellion, against the lawful government of the United States, therefore it must be true either that Smith, the tax purchaser, paid these unlawful taxes for the fiscal years 1861 and 1862, or that he did not, in either of which cases no title would vest in him, because if he failed to perform the condition precedent, the title would never vest, and if he did perform the condition precedent, then the investiture of the title would be void for the reason that it was based upon an unlawful act.

But it was not a condition precedent to the vesting of title in the tax purchaser that he should pay the taxes accruing on the land during the redemption period; if it be held that it was a condition precedent to the vesting of title that he should pay the taxes accruing on the land during the redemption period, still such condition precedent required the tax purchaser to pay only the lawful taxes levied and assessed thereon, and not the unlawful tax. So far as the pleadings in this case show, Smith, the tax purchaser, never paid any unlawful tax; it was not and is not unlawful for a citizen to pay an unlawful tax that was or may be levied against him.

WHITFIELD, C. J., delivered the opinion of the court.

The controlling question in this case is whether the sale of the land in controversy on May 6, 1861, for the unpaid taxes of 1860, and the tax deed delivered to the purchaser thereunder, in May, 1863, are void for the reason that the taxes of the two intermediate years—1861 and 1862—were in aid of the confederate states government.

Code 1857, ch. 3, art. 39, p. 80, provided:

"The collector shall file all deeds for land sold to the state, or other persons, in the office of the clerk of the probate court of the county, on or before the second Monday in May, there to remain for two years from the date of the sale unless sooner redeemed; and the owner of such land, or any person for him, may redeem the same within the two years by paying to the said probate clerk the whole amount of tax for which such land was sold, with all costs and charges consequent upon said sale, and fifty per centum damages upon the amount of said tax and costs, and also all state and county taxes that have accrued on said land since said sale, and also five per centum on the whole amount of such redemption for the compensation of the said clerk for making the same," etc.

Article 43, ch. 3, p. 82, of the same code provided:

"When any land shall have been sold for taxes and purchased by any person other than the state, the taxes thereon for all succeeding years until the same shall have been redeemed shall be charged by the collector to such purchaser or his assigns, and collected of him or them in like manner as other taxes due by him or them, and such land shall be liable to be sold for the taxes of such purchaser or his assigns, and if sold for the taxes of such purchaser or his assigns, and not redeemed by him or them, the persons as whose property it was assessed shall be entitled to redeem the same from the second purchaser, on payment only of the amount due in such second sale."

It is contended for the appellants that these two sections of the

law make it plain that when the purchaser paid the amount of his bid—fifty dollars—on May 6, 1861, the tax deed was deposited with the clerk of the probate court, there to remain until May 6, 1863, and that said purchaser, in order to obtain the tax deed, had necessarily to pay the taxes on the land in the years 1861 and 1862, since by the express terms of the statute taxes for these two years were charged against him, and that consequently the payment of said taxes was a condition precedent to his obtaining said tax deed; that the taxes for those two years, being largely made up of taxes in aid of the confederate states, were illegal taxes, and no title was imparted to the purchaser; and, finally, that the period of redemption must have fully expired and the owner have failed to redeem before the tax purchaser became entitled to the deed for the land. Undoubtedly the taxes for the years 1861 and 1862 did largely embrace taxes of the kind described, as held in *Shattuck* v. *Daniel,* 52 Miss., 836, and other cases cited in the brief of counsel for appellants. See *Dogan* v. *Griffin,* 51 Miss., 782; *Beard* v. *Green,* 51 Miss., 856. It is held in the case of *Shattuck* v. *Daniel* expressly that a tax sale made for the taxes of the year 1861 was absolutely void. It is therefore manifest that if it was a condition precedent to the vesting of title in the tax purchaser that he should pay the taxes charged against him under the law of the state at that time for the years 1861 and 1862, the sale must be declared void. A very ingenious and able argument is made to show that it was not a condition precedent, but that the purchaser at the tax sale, by the very fact of his purchase and the execution of the deed pursuant thereto, acquired an inchoate estate in land which vested in him immediately after the tax sale and the payment of his bid, which estate was subject to be defeated by redemption within two years, but that after the expiration of two years the title became absolute and unconditional in the tax purchaser. The complete answer to this proposition is the case of *Adams* v. *Mills,* 71 Miss., 150 (14 South. Rep., 462). So long as that decision remains

the law it must be held that the payment of these two years' taxes was a condition precedent to the vesting of the title.    In *Adams* v. *Mills* the court held that where, during the year for redemption, the tax deed was by the clerk marked "Canceled," and was delivered to one supposed to be the owner, who promised to pay the purchase money, but several weeks afterwards discovered that he was not the owner, and returned the deed without paying, whereupon the cancellation was stricken off by the clerk, all within the year, the tax title was thereby rendered void, because, said the court: "Under Code 1880, § 571, the provision requiring a tax deed to be deposited with the chancery clerk, to remain for one year, was for the benefit of the owner, and was a necessary part of the proceedings to divest his title."    This case is decisive of this particular point.    And as we understand the case of *Shattuck* v. *Daniel, supra* (p. 839), it supports the same doctrine.    The fact in that case was that the auditor had made a deed to the complainant from the state before the redemption period had expired.    On that point the court said:

"But when the right of redemption has been cut off, and not before, is the land subject to entry by a citizen?    The complainant purchased from the state on June 22, 1870.    Less than a year had elapsed from the date of the sale—in 1869—to the time of complainant's purchase.    The authority of the auditor to make sale is conferred by the statute—that is, after two years from the date of the purchase by the state, if in the meantime there has been no redemption.    We have seen that the state got nothing under the tax sale of 1862.    She did acquire an inchoate title by the sale in 1869, which would have become absolute, as a title of *prima facie* validity, after two years from that date. But, since the auditor allowed the complainant to enter the land and become a purchaser contrary to the statute, it follows that he did not obtain the state's title."

It is said, again, that on demurrer there is nothing in the pleadings to show that the purchaser paid the taxes of 1861 and 1862.

The response to this is that the pleadings show that the purchaser got the tax deed, and that the presumption of law available on demurrer is that he could not have gotten it without having paid to the probate clerk the taxes which the law made it the duty of the clerk to collect, the presumption being that the clerk did his duty. It is said, again, that, if it was a condition precedent that the tax purchaser should pay the taxes accruing on the land during the said two years—1861 and 1862—such condition precedent required him to pay only the lawful taxes, and not the unlawful taxes; that that which required the performance of unlawful acts could not itself have been "really the law"—as counsel phrase it, "the actual law;" and that since, as a result of the war between the states, these taxes were illegal and the act imposing them illegal, therefore the court should hold that, although Code 1857, ch. 3, art. 43, required the taxes of these two years to be paid, the act must be read as if that part was blank paper, and so the purchaser could only be held bound to pay the lawful taxes imposed by the lawfully constituted authorities. Say counsel, pursuing this argument:

"So true is this that Smith might have declined to pay the war taxes, and have allowed his land to sell for the payment thereof; yet he would not have been in default, and under the law no court would have held him in default, because of his nonpayment of such unlawful taxes. . . . It was not the lawful duty resting upon Smith, either as tax purchaser or as citizen, to do any act which in the last analysis was unlawful. It was not his lawful duty to aid in rebellion against the lawful government—against the United States; nor did art. 43 of the revenue act of the code of 1857 require him to do so as a condition precedent to the vesting of his title. It only required him to do that which was lawful, nothing else. It made no difference if at the time he thought it was lawful for him to pay the war taxes or not; and the sole proposition under consideration is, What was Smith's lawful duty at the time? Nothing would have made any single

act which was in defiance of the statutes and law of the United
States valid, except the success of the confederacy."

And counsel insist that the argument for appellants proceeds
upon the erroneous hypothesis that the acts in contravention of
the laws and constitution of the United States were void as
against that government, but valid in Mississippi.    "This,"
they say, "never can be true, because the supreme court of the
United States has always held that Mississippi has never been
out of the union."

We have quoted this much from counsel's brief because the
quotation presents the *crux* of their whole contention.    Counsel
misconceive the true view on this subject, as stated in *Texas* v.
*White,* 7 Wall., 732 (19 L. ed., 227) ; *Shattuck* v. *Daniel, supra;*
and *Buck* v. *Vasser,* 47 Miss., 559.    The court takes judicial
knowledge of the condition of the country in 1861, of what the
status—the actual status—of Mississippi was at the time.    The
United States supreme court, and all other courts of the union,
judicially knew that war was flagrant, and that Mississippi had
a *de facto* government, with *de facto* officials, which officers were
bound, necessarily, to execute the mandates of the *de facto* gov-
ernment then in power and exercising authority.    *Dewing* v.
*Perdicaries,* 96 U. S., 193 (24 L. ed., 654).    The acts of the
legislature in aid of the confederacy were, of course, void in law.
No title acquired in pursuance of a tax sale such as this could,
therefore, possibly be valid.    Counsel admit the act to be void
in so far as it imposes the duty on the probate clerk of collecting
the taxes of the years 1861 and 1862 ; but they deny that the pro-
bate clerk was bound by what they call "the actual law" to exact
the payment of these taxes.    It may be quite true that the act of
the clerk in exacting the payment of the taxes was in pursuance
of an illegal act, as a matter of law, according to the result of the
civil court; but it is none the less true that at the time he acted
he was the *de facto* official of a *de facto* government, bound to
obey the authority of such government at his peril.    It was not

part of his duty to determine at that time whether these taxes were legal or illegal. All he had to do was to obey the statutes of the state as written, and the legal presumption is that he did obey what was to him the law. The supreme court of the United States, in *Texas* v. *White,* says:

"The legislature of Texas, at the time of the repeal, constituted one of the departments of a state government established in hostility to the constitution of the United States. It cannot be regarded, therefore, in the courts of the United States, as a lawful legislature or its acts as lawful acts. And yet it is a historical fact that the government of Texas, then in full control of the state, was its only actual government; and certainly if Texas had been a separate state, and not one of the United States, the new government, having displaced the regular authority and having established itself in the customary seats of power and in the exercise of the ordinary functions of administration, would have been construed in the strictest sense of the words a *de facto* government, and its acts during the time of its existence as such would be effectual, and in almost all respects valid. And to some extent this is true of the actual government of Texas, though unlawful and revolutionary as to the United States. It is not necessary to attempt to any extent definitions within which the acts of a state government must be treated as valid or invalid. It may be said, perhaps with sufficient accuracy, that acts necessary to peace and good order among citizens— such, for example, as acts sanctioning and protecting marriage and the domestic relations; governing the course of descents; regulating the conveyance and transfer of property, real and personal; and providing remedies for injuries to persons and estates; and other similar acts, which would be valid if emanating from a lawful government—must be regarded in general as valid when proceeding from an actual, though unlawful, government, and that acts in furtherance or support of rebellion against the United States, or intended to defeat the just rights of citi-

zens, and other acts of like nature, must in general be regarded as invalid and void. ˜6 Rose's Notes on U. S. Reports, 1071."

We understand this to be the settled course of decision on this subject by the United States supreme court, and it will not do to say that, because the result of the great civil war made the act of the legislature in so far as it required the payment of the taxes of the years 1861 and 1862 void as a legal proposition, the court, in passing upon the validity of the tax title where the tax pur-- chaser actually did pay the illegal taxes and the probate clerk actually did exact them, is to be governed by the fanciful supposition that the purchaser coming to pay the taxes of 1861 and 1862, or the owner coming to redeem, would tender only the legal taxes, instead of being governed by what actually did occur as to all these parties.

But it is insisted, again, that on this demurrer there is nothing in the pleadings to show that the tax purchaser did pay these taxes or that the probate clerk did exact. them. The legal presumption that the clerk did his duty and the possession of the deed by the purchaser sufficiently meet this point. It is further obvious that the owner could not have redeemed this land unless he·had paid, as required by the act, the whole amount of taxes, legal and illegal; and under the authority of *Adams* v. *Mills, supra,* this would render the tax sale void. This argument is sought to be met by the same line of thought above referred to : that the owner was not required to tender any illegal taxes—that is, taxes shown to be illegal by the result of the civil war. This all comes back to the proposition above discussed and disposed of. The trouble with the argument. of counsel for appellees is that it blinks the great controlling fact, recognized in all well-considered cases, that the state was a *de facto* government, at least as to all matters "parcel of its civil administration" within its borders; and, consequently, whether this tax title is valid or void must depend upon the facts as they actually occurred, and not upon a theory as to how they ought to have

occurred—that is to say, the actual legal status imparted to them by the result of the civil war. We speak, of course, of acts, like this one, manifestly in aid of the confederate states. We have here the act of the legislature requiring the payment of the taxes of the years 1861 and 1862; we have the actual payment of these taxes by the purchaser to the probate clerk; we have the tax deed delivered in pursuance of such payment by the probate clerk. Such a sale is manifestly void, and cannot possibly be saved by any metaphysical subtlety which asks us to hold that, because the result of the civil war made such an act illegal, therefore the probate clerk at the time should have dealt with the act as being illegal and not have collected these illegal taxes, and the court must not deal with the situation as it was, with judicial knowledge of the whole situation—the attitude of the state and its officials and the real conduct of the parties to the transaction. We are of the opinion, therefore, in the light of the authorities cited in the briefs on both sides, that the tax deed set up by the appellees is void.

*The decree is reversed, the demurrer to the cross-bill is sustained, and the cause remanded.*