Appellee filed his bill in the chancery court of Leflore county on behalf of the Yazoo-Mississippi Delta levee board against appellants, R.T. Clark Co., a partnership composed of R.T. Clark, R.L. Cheshire, R.P. Harris, and C.H. Dulaney, levee construction contractors of the said levee district, and the United States Fidelity Guaranty Company, surety on their contractors' bond, to recover from the contractors the sum of three hundred seventy-eight thousand three hundred thirty dollars, with interest, and from the Guaranty Company one hundred sixty thousand dollars of that amount, the penalty of the contractors' bond with interest, as damages suffered by the levee district, because of an alleged breach by the contractors of a levy construction contract theretofore entered into between the said R.T. Clark Co. and the Yazoo-Mississippi Delta levee board. Copies of the contract and of the bond were made exhibits to the bill. A trial was had on bill, answers, and proofs, resulting in a final decree in favor of the appellee for the amounts sued for with interest. From that decree, appellants prosecute this appeal. *Page 236 
This is the second appearance of this case in the supreme court (Clark v. Miller, 142 Miss. 123, 105 So. 502). The former appeal was for the purpose of settling the principles of the cause; and the case as then presented, with the opinion of the court, should be considered in connection with this case in order to get the full meaning of the present decision. The bill first filed made R.T. Clark Co., the Guaranty Company, and the members of the levee board who voted for the raise in the contract price of the levee work, defendants, and sought the same recovery against R.T. Clark Co. and the Guaranty Company as in the present case, and, in addition, sought to hold the levee commissioners who voted for the increase in price and the sureties on their bonds liable for such increase in price. On the former appeal, the court held, among other things, that the bill was multifarious; that separate suits should have been brought against R.T. Clark Co. and the Guaranty Company on the one hand, and the levee commissioners who voted for the increase, and the sureties on their bonds on the other hand; and on the remand of the case that was accordingly done. Substantially the same bill, as was originally filed against all the parties, was filed against the appellants in this case. The allegations of the bill are set out in the opinion of the court on the former appeal, and we deem it unnecessary to repeat them here.
The Guaranty Company, R.T. Clark, and R.P. Harris separately answered the bill denying that the contract had been breached by R.T. Clark Co., and averred, in substance, that the participation of the United States in the World War had increased the cost of labor and materials going into the levee work to such an enormous extent as to render it impossible for the contractors to complete the work at the contract price without great loss, and for that reason the levee board, recognizing the emergency for the completion of the work, raised the contract *Page 237 
price fifty per cent. Dulaney, one of the partners in the firm of R.T. Clark Co., adopted the answer of the Guaranty Company; Cheshire, the other partner, did not answer.
There was no conflict in the material evidence; and we think a fair statement of the evidence in the case is contained in the brief of the Guaranty Company and that of the revenue agent, which follow in the order referred to:
"Clark, Harris, Cheshire and Dulaney were not partners generally. Each had his outfit and was doing construction work with it. They got together to bid on this particular work with a view to dividing it up among themselves and each doing a part. They contracted with the Levee Board as R.T. Clark Company. They were referred to in the bond as R.T. Clark, R.P. Harris, R.L. Cheshire and C.H. Dulaney, trading as R.T. Clark Company, and they signed the bond R.T. Clark Company, by R.T. Clark, by R.P. Harris, by R.L. Cheshire, by C.H. Dulaney, by L.C. Dulaney, Agent and Attorney-in-fact. At the time they bid on this work and got the contract Dulaney's outfit was at work on a contract in Louisiana and it was understood between them that he was to finish that work before coming on this. Clark, Harris and Cheshire moved their outfits on the job and started work the last of 1916 or early in 1917. The date could not be definitely fixed and the exact time is uncertain. The Engineer, Mr. Head, thought it was in February, 1917 which was probably correct in view of the fact that the first estimate allowed was on the 1st of March, 1917, but the actual date of beginning the work is not material. It was begun, at all events, before April 1, 1917 when the contract provided they were to begin if river conditions permitted. They were first hindered in their work by rains and high water. The United States having entered the war with Germany begun to draft their labor and left them without sufficient men to man *Page 238 
their teams at times. War conditions were greatly increasing the cost of labor and material and the cost of doing the work. In the months of July, August, September, October, November and December, 1917, the board appears not to have had any money to pay them for their work and gave them estimates not payable until January 10, 1918, which the contractors had to raise money on their bank. In the winter of 1917-18 they had unusually cold weather and heavy snows and the flu epidemic hit their camps and they had further difficulty in carrying on their work. Dulaney, it seems, had on account of the increase of the cost of everything, met his Waterloo in Louisiana and his creditors had taken his outfit away from him and he had never been able to join his partners in this work. The others, Clark, Harris and Cheshire, had carried on in spite of everything. Cheshire's creditors, however, sometime during 1917 took his outfit away from him and his partners were deprived of his assistance. Clark and Harris thereafter carried on alone. Clark and Harris were evidently considered to be making the best progress possible under the conditions, for it does not appear that the engineer attempted to put any force account on them under Section 9 of the contract hereinbefore referred to; Mr. Head testified, in effect, that he had no criticism to make of their efficiency. In the early part of 1918, inferably February, 1918, as we find the first mention of it in the Minutes of the board's meeting of February 5, 1918, Mr. Clark on behalf of his firm appeared before the Levee Board and told them that the war had greatly increased the cost of labor and material and that the work in consequence was costing much more than the contract price, and that two of his partners, Dulaney and Cheshire, had gone completely broke and their creditors had taken their outfits away from them and they were not helping, and that he and Harris who were doing the work were nearly broke and *Page 239 
that while they would go on until their creditors stopped them, they could not go but a few months longer unless the board helped them by increasing their contract price; and he told them that the Mississippi Levee Board at Greenville and the Levee Board in Arkansas had increased prices under similar contracts and submitted data on the prices of materials used by them. Mr. Head, the Engineer, testified to Mr. Clark's having made practically the same statement to Major Dabney and himself, inferably, before he appeared before the board since Major Dabney was ready with a report and recommendation on the increase at the meeting of February 5th. Clark and Harris had not at that time stopped working, nor did Mr. Clark in his statement refuse to proceed or threaten to stop if they were not granted the requested increase. The minutes of none of the meetings of the board at which this matter was considered, recited that Clark refused to proceed or threatened to stop. The board at the meeting of February 5, 1918, provided for the appointment of a committee of five, including the President, to investigate the condition of the work under the contract and the changed economic conditions and report to the board within fifteen days. That committee at the next meeting which was March 1, 1918 reported, in effect, that they had found the advance in prices of labor and material as represented by Clark and that they had been unable to get any contractor to make a price on the unfinished work because of the unsettled conditions and rapid advance of the price for labor and material and that they had been advised by the Chief Engineer that fifty per cent. increase of the contract prices would be fair and they recommended that the board raise the price on the work; and an order was pursuantly made to that effect. Apparently some doubt arose in the minds of the representatives of the board who were authorized to put the increase into effect, as to the power *Page 240 
of the board to allow the increase, because at the meeting of March 12, 1918, the board passed a resolution suspending action under that order until a written opinion could be obtained from the attorney-general and the attorney and the chief engineer and the board and from the supreme court through the governor, if possible. The attorney-general was applied to, and under date of March 20, 1918 gave his written opinion to Mr. Gerald FitzGerald, attorney of the board, to the effect as we read it, that the board did not have the authority to grant the increase. In some way he seemed to think section 100 rather than section 96 of the Constitution was in the way. It appears that the addition of some new work had been suggested to him as a basis for the increase but instead of advising the board whether the addition of new work would be a sufficient basis to warrant an increase of the price, he discussed whether or not this work could be let without advertisement, and concluded by advising the board that by advertising the new work they would protect themselves from any charge that they were violating section 100 of the Constitution. That opinion for the reasons mentioned, could not have been of much value to the board but it at least appears to have given them an idea, namely, that by advertising for bids for the unfinished work it could close the door to any question as to getting the work done for less than the proposed increased price, for we find that the board at its next meeting, to-wit, that of April 16, 1918, entered an order rescinding the order for the increase and directing the secretary to ascertain from the engineer of the board what work remained unfinished under Clark 
Company's contract, and advertise the reletting of the unfinished work, bids to be opened the 30th day of April, 1918; and several of the witnesses referring to the advertisement as having been made on the suggestion of the attorney-general. The minutes recite that this action *Page 241 
in reference to advertising for bids was taken at the request of R.T. Clark Company and was in pursuance of a written agreement that in so doing they would not release Clark or their sureties, and the agreement referred to is spread upon the minutes. Mr. Gerald FitzGerald, then attorney of the Levee Board, testified that Clark Company had not breached their contract and that the primary purpose of the advertisement was not to relet the contract, but find out whether there were others who would offer to do the work for less than the proposed increase of the contract price. The complainant attempted to rebut Mr. FitzGerald's testimony by introducing only two of the members of the board, Mr. J.L. Harris and Mr. A.E. Dugger. Those gentlemen thought the purpose of the advertisement was to relet the contract, but when asked, they could not reconcile the advertisement to relet with the fact that Clark Company had not stopped and were going right along with the work. We call the court's attention in this connection to the fact that the minutes of the meeting of April 5, 1918, at which the advertisement was ordered, contains no recital at any place to the effect that Clark Company had breached their contract, or that the work had been taken out of their hands under the terms of the contract. We ask the court, too, to note in this connection the care with which the board set forth in its minutes that the advertisement was made by agreement with Clark Company. The complainant made no attempt in this connection to show that the commissioners gave notice to the Guaranty Company that Clark Company had breached their contract and that the work was to be relet. Mr. FitzGerald, on the other hand, testified expressly that there being no breach claimed, no notice was given. At the board's next meeting April 30, 1918, Clark Company filed a written statement to the effect that they had consented and requested the board to readvertise the unfinished work, in order that they might know *Page 242 
that their request for a fifty per cent raise in compensation over that set out in the contract, under present war conditions, was reasonable and fair to all concerned. Mr. FitzGerald testified that Mr. Clark presented that statement to the board at that meeting. In the minutes of the meeting of April 30, 1918, following a recital of the papers in which the advertisement had been made and a copy of the advertisement as published therein, there appears the following recital:
"`Came on then to be heard the matter of opening the bids on said work as described in said advertisement which said work was formerly let to R.T. Clark Company, November the first, nineteen hundred and sixteen and said advertisement being made at the request of R.T. Clark Company and upon suggestion of the attorney-general, and it appearing to the board that although there were present at this meeting of the board a number of contracting firms who usually contract for levee work, to-wit, Roach Stansel and Lowrance Brothers, and others, but no bidders appeared before the board and no bids were filed with the board; thereupon the board took up the contract of R.T. Clark Company, of date November the first, nineteen hundred and sixteen, to investigate the same and decide what was best to do for the interest of the Yazoo-Mississippi Delta Levee District with regard to the finishing of said work.'
"The recitals in Maynard FitzGerald's letter under paragraph beginning `Second,' bear out Mr. FitzGerald in his understanding of the purpose of the advertisement. With Maynard FitzGerald's letter they submitted the attorney-general's opinion of March 20, 1918, hereinbefore referred to, and a supplemental opinion of date March 29, 1918, in neither of which letters is there any reference to the contract's having been breached; on the contrary Clark Company are referred to as not having breached their contract and forfeited their bond, and being *Page 243 
in performance of their contract. The minutes of that meeting then contain an order increasing Clark Company's price because of war conditions and because of the impossibility of `any living contractor' being able to do the work under the original prices, but provides that the increase is granted on condition that a letter be procured from the surety on the bond that the increase will in no wise affect liability under that bond and that Clark 
Company provide an additional bond in the sum of eighty thousand dollars conditioned for performance of the contract of November 1, 1916, to be approved by the attorneys of the board. It is to be noted that that order does not refer to R.T. Clark Company's having made a bid pursuant to the advertisement, but to the proposed increase of the original price; and does not state that any new contract is to be made by R.T. Clark Company, but simply refers to the contract of November 1, 1916 as that under which the increase is to be made; and does not refer to R.T. Clark Company as a different partnership but as the R.T. Clark Company contracting under the contract of November 1, 1916. Mr. Clark testified that there was no bid put in, that they simply had made a proposition for an increase, and the board after making the advertisement granted the increase, Mr. Harris, his partner, testified to the same effect. Mr. Head, the engineer, completely bore them out in their statements. Mr. Clark was very vague about whether there was a new contract after the advertisement. Mr. Harris, however, definitely stated that there was no new contract, that they had the original all the way through. Mr. Collier who had been the board's office man, testified that he found no agreement except what appeared on the minutes. Mr. Head, the engineer, testified that there was no new contract; simply a continuance under the same contract; he also testified that there was not even a schedule of new prices made up and that the engineer *Page 244 
simply calculated a fifty per cent. increase when payments were made. Mr. FitzGerald, the attorney, testified definitely that the board made no new contract. Mr. Mangum, president of the board, was the only commissioner asked about whether there was a new contract, and he said he had no recollection of any. Mr. Clark testified that Dulaney and Cheshire having had their outfits taken from them by creditors, were not able to do any part of the work and he referred to them as having dropped out, and that he did not know whether they were in or out, meaning, of course, out of the firm or partnership; that no legal steps were taken to put them out of the firm, and that no change was made in the name of the company, and that he and Mr. Harris just went along with the work. Mr. Clark was asked if the firm was then composed of just himself and Harris, and the court sustained an objection from the defendants to that as calling for a mere opinion. Mr. Harris definitely testified that he and Clark and Cheshire formed no new partnership. When he was asked how long Mrs. Dulaney remained a member of the partnership, he stated that she was a member yet as far as that was concerned. There was no showing that Clark and Harris attempted to release Mrs. Dulaney or Cheshire from their partnership obligation, because they had lost their outfits and were not able to take part with them in carrying on the work, that is to say that there had been a dissolution between the partners of the firm; and what is more important, there was no showing that the board released Mrs. Dulaney or Cheshire from their obligations as members of the firm or partnership. There was no evidence that Mrs. Dulaney or Cheshire had died and that a dissolution had resulted from that. The minutes do not show nor was there any evidence adduced, showing that the consent of the Guaranty Company as surety was asked or obtained, to the change in the contract, and it is inferable that the *Page 245 
board or its representatives having the matter in charge, overlooked requiring compliance with that provision of the order. The additional bond, however, was required and furnished and approved by Maynard FitzGerald, the attorneys. This bond names as principal, R.T. Clark Company, a firm composed of R.T. Clark, E.L. Cheshire (the `E' of course being a clerical error of the clerk in transcribing), R.E. Harris, the (`E' in Mr. Harris' name being also, of course, a clerical error in transcribing), and blank. It is to be noted that thus Cheshire although he had `dropped out' as Mr. Clark expressed it, was considered still a member of the firm. The blank was evidently left for the name of Mrs. Dulaney, and it was left blank doubtless because the attorney drafting it did not recall at the time the name of the third partner and left the blank so that name could be inserted. Mr. FitzGerald, in fact, so testified. Mr. FitzGerald, also definitely testified that he considered that the R.T. Clark 
Company therein referred to was the same firm and in effect, that, he overlooked the fact that Mrs. Dulaney's name had not been put in the bond, and that she had not signed it when he approved it. The bond was signed by R.T. Clark Company, by R.T. Clark, R.P. Harris, R.L. Cheshire. The additional bond also clearly refers to the contract of November 1, 1916, with the price raised for the benefit of the principals, as that being guaranteed, and further, that it is `additional security' given `in addition to and concurrently with the security already given under said contract,' thus negativing any idea that there was a new firm, a new contract, and that this was a new bond for the performance of a new contract of a new firm.
"Clark and Harris continued their work throughout the negotiations for the increase, and after the increase went right along and finally completed the work and received final settlement. In 1920 during the progress of *Page 246 
the work and before completion Clark Company applied for another increase on account of the conditions following the war which it is well known further increased the cost of everything, and the board granted that increase and in its minutes and in the correspondence between Major Dabney and the President of the board, and between Maynard FitzGerald, the attorneys, and the board, and Maynard FitzGerald and the attorney-general with them, and the instruments executed by the sureties on the original and additional bond giving consent to this further increase, refer to the contract as that of November 1, 1916, and R.T. Clark Company as the R.T. Clark Company of that contract. It might be well to state that in addition to the effect of the after-war conditions, the addition of a large amount of extra emergency work, was the basis of this final increase. It might be further stated that that increase is the basis of the other suit resulting from the split of the original action hereinbefore referred to. The final action of the board in reference to Clark Company's contract was a reduction of the price in March, 1921, and there is nothing in the minutes of that meeting that indicates that there was any different contract from that of November 1, 1916, or any different firm from the R.T. Clark Company entering into that contract.
"There was no showing by the minutes of the board or otherwise, that the board after the completion of the work or before, considered that Clark Company had breached their contract at any time and that they had any claim for damages against Clark 
Company and the Guaranty Company as surety on their bond. It appears that the revenue agent alone years after these transactions and completion of the work, conceived the idea that Clark Company, in 1918, had refused to proceed further with their work and had wholly abandoned their contract, and that the commissioners had *Page 247 
treated that contract as breached and had relet the work to a different firm at an increased price, and that the board of commissioners had a right of action against R.T. Clark Company and their surety for damages."
The evidence mainly relied upon by the revenue agent to show a breach of the contract was as follows:
R.T. Clark testified:
"Q. Yes, now you say Mr. Cheshire did about, worked about two months and somebody took his outfit from him? A. Yes, sir.
"Q. What do you mean by that? A. Well somebody — some of his creditors came down there and took it.
"Q. Did he continue to be a member of the firm of R.T. Clark 
Company up to April 1918? A. He never did pretend to do anything any more after he went broke.
"Q. Early in the year 1918 Cheshire and Dulaney both had become financially unable to go ahead hadn't they? A. Yes, sir, they were both broke I believe.
"Q. They were busted and out? A. Yes, sir.
"Q. Well did you or not appeal to the commissioners, reporting to them that you could not complete the work and that you had lost a fortune in it? A. We had started that thing right and might say — We worked along there in 1917 to a disadvantage, with a shortage of labor, and everything jumped right up higher and higher — War was declared, and we went until we were about as broke — about in the same fix as the others was.
"Q. And you told that to the commissioners didn't you? A. Yes, sir, I think we acknowledged that we were broke. Yes, sir.
"Q. And you further told them that it would be impossible — A. How is that, sir?
"Q. You told them it would be impossible for you to complete the contract at that price didn't you? A. I expect probably that I did. I cannot remember just telling them that — just what I told them. That has been so long ago. *Page 248 
"Q. Well was it a fact? A. Yes, sir, we had gone practically broke.
"Q. Yes, well you were present, were you not and consented that this work be advertised were you? A. Yes, sir.
"Q. And threw up there and advertised to the whole world that you consented to it for other people to come in and bid on completing the work on that contract? A. Yes, sir.
"Q. Doing the work you had abandoned? A. Yes, sir.
"Q. How long were you negotiating with the board, trying to get a better contract for the completion of the work than the original one? A. I do not remember the exact length of time.
"Q. Something like a couple of months? A. Yes, sir, and probably longer, at any rate, it was after — after the material and supplies and stuff we had to use in our performing our work had went sky high and we would not — oh — just could not go any further without help.
"Q. Now did you represent that — inform the board that, that they (Cheshire and Dulaney) had laid down on you and refused to go on? A. I think that the board knew it, yes I think that I told them."
Mr. Harris testified in part:
"Q. Were you present at the meeting of the board when Mr. Clark presented the claim that they ought to have a raise? A. Not at the first one.
"Q. Not at the first one? A. No, sir.
"Q. You were not at the meeting when he told them that? A. No, sir, I was not at the first meeting.
"Q. When he told them that he could not go ahead with it? A. No, sir, I was not there.
"Q. Well now then was it a fact that it was impossible for anybody to do that job at the price of your 1916 *Page 249 
contract? A. Well if the war had not been declared we would have made some little money I think.
"Q. Well but I mean since the war was declared? A. Well, no, it was impossible.
"Q. It was impossible for you to carry out that contract. Mr. Clark was correct then if he stated to the board that it was impossible for you all to carry it out at those prices? A. I think it was; yes, sir.
"Q. That is what you thought at that time? A. Yes, sir, that is the way I felt about it."
Mr. Mangum, member of the levee board, testified:
"Q. Alright now then state what Mr. Clark, as a member of the firm of R.T. Clark Company represented to the board as to his condition and as to his ability to go ahead and complete this contract? A. Mr. Clark stated that he was broke and that he would be unable to complete the contract, unless the Board increased the contract price to an amount that would be commensurate to the cost of building levees at that time.
"Q. Mr. Mangum, from whom did you get your opinion that it was impossible for the R.T. Clark Company to complete this work under their original contract? A. I got it from Mr. Clark and I think Major Dabney made the statement also. . . . A. No, sir. Did I understand you to ask the question, if at that time we had any statement indicating that it would be possible for him to complete the contract?
"Q. Yes. A. No, sir.
"Q. At what meeting of the board did Mr. Clark make this statement that you have testified to, to the effect that he was broke and was unable to go on with the work? A. He made that statement more times than one. I think that he made it in '18 — early '18 or maybe the latter part of 1917.
"Q. There wasn't any occasion then for you to take action after he made that statement as he was continuing *Page 250 
to work? A. Why it put us on notice that he was broke. He said that he had lost his fortune, and that he also lost the money that he had made in Arkansas and if my memory serves me right, he made the statement also that he had about ten thousand dollars left, and if we insisted on his going on that he would spend the ten thousand dollars, but that it would be a mere drop in the bucket and then he could go no further, and knowing the character and the great amount of work unfinished on the work, we knew that the ten thousand dollars would be but a drop in the bucket."
(After stating the case as above.) It is true, as contended by the revenue agent, that the positive refusal to perform a contract is a breach of it, although the time for performance has not arrived, The Law of Public Contracts (Donnelly), section 304, p. 435; but the mere assertion of a party to a contract that hewill be unable, or will refuse, to perform his contract is not sufficient to constitute a breach. There must be a distinct, unequivocal, and absolute refusal to perform, treated and acted upon as such by the other party to the contract. A mere assertion of inability to go on with the contract is not a repudiation of the contract. The intention to abandon the contract at some future date is not a breach of it unless such intention is declared in positive terms and unconditionally. When it is so declared, the other *Page 259 
party has an opportunity to accept the declaration if he chooses to do so. Benjamin on Sales, section 568; United States v.Smoot, 15 Wall. 36, 21 L.Ed. 107; Dingley v. Oler,117 U.S. 490, 6 S.Ct. 850, 29 L.R.A. 984; Kilgore v. BaptistEducational Association, 90 Tex. 139, 37 S.W. 598; The Law of Public Contracts (Donnelly), p. 438; 6 R.C.L., section 387, p. 1028; Elliott on Contracts, section 2032. Applying these principles to the facts as conclusively shown by the evidence, we think it clear that there was no breach of the contract by R.T. Clark Co. The orders and resolutions of the levee board spread on their minutes, give the history of what occurred with reference to the alleged breach of the contract; and there is no other evidence in the case which contradicts such orders and resolutions in any material particular.
The negotiations between the contractors and the levee board, bearing on the question, cover a period of something like two or three months of the first part of the year 1918, and, while they were going on, the contractors were proceeding with the work under their contract — never stopping, nor expressing any intention of abandoning the work, unless, and until, they were overtaken by bankruptcy. On the contrary, they gave the levee board to understand that they would continue the work as long as their creditors would permit them, although it was thoroughly understood by both parties that, if the prevailing prices of labor and materials going into the work, brought about by the World War, continued, bankruptcy would ensue. There is no other reasonable interpretation that can be put upon the orders and resolutions of the levee board, taken in connection with the other evidence in the case, than that the increase of fifty per cent. in the contract price was granted by the levee board in order to insure against the contractors' abandoning their contract at some future time. The increase, therefore, was not in recognition or acceptance of a breach of the contract *Page 260 
that had already taken place. The fight made by both parties, from the beginning to the end of the negotiations, was to bring about conditions that would prevent a breach of the contract. There is nothing whatever in the resolutions and orders of the levee board to bear out the theory that R.T. Clark Co. had breached their contract. The correspondence between the levee board and the attorney-general and the levee board and its attorneys shows conclusively, we think, that there was no thought in the minds of any of the parties concerned that R.T. Clark 
Co. had abandoned and breached the contract.
The record shows that the unfinished levee work was emergency work — necessary to be completed without delay in order to prevent disastrous floods from the Mississippi river. It is true that R.T. Clark Co. were perfectly willing to abandon the contract if agreeable to the levee board, but the levee board was not willing for them to do so. Conditions were such that if the contract had been breached and the Guaranty Company had paid the levee board the full penalty of its bond, one hundred sixty thousand dollars, the levee board had no assurance that the contract for the work could be relet at the original price plus one hundred sixty thousand dollars, the proceeds of the bond. On the contrary, judging from the evidence in this record, the indications were that a reletting of the contract would have resulted in an increase of more than fifty per cent. of the original contract price. In other words, viewing the situation as it existed at the time, it appeared to the levee board that the best interest of the district required that R.T. Clark Co. carry out their contract instead of breaching it, and to that end they seem not to have left anything undone.
The facts and circumstances relied on by the revenue agent as constituting a reletting of the contract do not show a reletting, but instead a method adopted which the *Page 261 
levee board conceived would legalize an increase in the contract price. We think no other reasonable interpretation can be placed on what occurred. It is true that bidders were present, but no bids were made. R.T. Clark Co. were represented but put in no bid, it being understood that they were to go on with the work and receive a fifty per cent. raise in the contract price, provided the alleged reletting developed that such increase was reasonable, which it abundantly did. No new contract was made with R.T. Clark Co.; they merely agreed to carry out the old contract of November 1, 1916, at the increased price. There is nothing in the minutes of the levee board to show that there was a reletting of the work and a new contract. The contractors gave an additional bond of eighty thousand dollars to carry out the old contract — not a new contract. The guaranty bond then in force provided as a condition precedent to liability thereon, in the event of a breach of the contract, that the levee board give the Guaranty Company notice of such breach and afford it an opportunity itself to complete the contract. We are not deciding, under the particular facts of this case, that a failure to give such notice would defeat a recovery against the Guaranty Company, but we do think that the failure of the levee board to put anything on its minutes declaring that a breach of the contract had taken place and requiring notice thereof to be given to the Guaranty Company, in accordance with that stipulation in the bond, is most significant. The stipulation in the bond for notice was an important provision of the bond, to say the least.
There seems no escape from the conclusion that everything that was done by R.T. Clark Co. and the levee board, relied on by the revenue agent as constituting a breach of the contract, and the reletting of the contract, was done by agreement between the parties. There is no such thing known to the law as the breach of a contract by agreement of the parties. *Page 262 
The revenue agent lays especial emphasis on parts of the testimony of the witnesses Clark, Harris, and Mangum, as showing a breach of the contract. Viewing the parts of their testimony relied on in the most favorable light to the revenue agent, it amounted to this: When the contract price for the work was increased by the levee board, R.T. Clark Co. were practically bankrupt; they had only about ten thousand dollars in money left with which to prosecute the work. One of the witnesses testified that R.T. Clark Co. had abandoned the contract; the other two testified that there was a reletting of the contract. But it is manifest that these witnesses in so testifying were merely drawing their own inferences from the proven facts about which there was no conflict in the evidence. In other words, they were merely giving their opinions as to what the proven facts meant. Such opinions do not change the proven facts; on the contrary, they must yield to them.
The revenue agent contends that there was a dissolution of the firm of R.T. Clark Co., two of the members going out of the firm, and a reletting of the contract to a new firm with the same name but with different partners, and for those reasons the contract was breached. We do not think there is any merit in that contention. The evidence shows that one of the partners, Dulaney, had never entered upon the work, and, after the work began, another, Cheshire, dropped out, because his equipment necessary to do the levee work had been taken from him by his creditors. The other partners proceeded with the work without objection from the levee board, carrying on the work for and on behalf of the partnership. There was no dissolution of the partnership as between the partners. When one partner undertakes to perform a contract entered into by his partnership and later quits and turns the performance of the contract over to his copartner, the performance by the latter is on behalf of *Page 263 
both partners. Excello Feed Milling Co. v. U.S. Fidelity Guaranty Co., 145 Miss. 599, 111 So. 94; Adams v. Haigler,123 Ga. 659, 51 S.E. 638; 20 R.C.L. p. 974, section 204; 30 Cyc., p. 659.
The result is that the amount paid R.T. Clark Co. by the levee board above the contract price was simply an overpayment. The rule is that sureties on bonds for the performance of contracts are not liable for moneys improperly paid. EdwardsCounty v. Jennings (Tex. Civ. App.), 33 S.W. 585; Gage Spencer v. Road Improvements Dist., 159 Ark. 642, 252 S.W. 922; McGregor Henger v. Escajeda (Tex. Civ. App.),216 S.W. 398.
R.T. Clark Co. contend that the participation of the United States in the World War rendered the performance of the contract on their part legally impossible; that the exercise by the Federal government of its war powers under the Constitution made the contract impossible to perform, because of the drafting of their labor and the enormous increase in the costs of labor and materials necessary to carry on the levee work, and, therefore, the increase in price was justified and legal. The principle upon which this contention is based is that the war powers of the Federal government under the Constitution are paramount to all state authority, including the Constitution of the state. The contract in question was entered into November 1, 1916; the World War began August, 1914. For two years thereafter there were many aggressions by Germany against the sovereignty of the United States which indicated that the United States would become involved in the struggle. Among such indications was the enactment by Congress, on June 3, 1916, at the suggestion and with the approval of the President, of the National Defense Act. In August, 1916, the Council of National Defense and the War Industries Board were created, and many executive orders were promulgated by the President preparatory to war. There *Page 264 
was a proclamation by the President in which he took possession of, and assumed control of, the transportation systems of the country for the purposes of war. All of these matters will be taken judicial notice of by the courts, and knowledge thereof will be charged to persons affected thereby. In the face of this knowledge, R.T. Clark Co. entered into the contract involved. At the time of the execution of the contract, business conditions created by the World War were such that contractors doing levee work will not be heard to complain. They will be chargeable with notice that what occurred might have been reasonably expected. The contract involved contained no stipulation excusing performance because of conditions brought about by the war; and now such a condition will not be implied by the courts. London Lancashire Indemnity Co. v. Board of Commissioners, 107 Ohio St. 51, 140 N.E. 672; Columbus Ry. Power Light Co. v. Cityof Columbus (D.C.), 253 F. 499; Ingram-Day Lumber Co. v. KolaLumber Co., 122 Miss. 632, 84 So. 693. It was held in the first case cited that in order to make available the defense of legal impossibility of the performance of a contract by reason of governmental interference in the control of production, labor, and transportation in the prosecution of the World War, it must be proven that there was either actual seizure or such direct intervention or governmental mandate as prevented further performance of the contract. The contractors made no such case here.
Under section 96 of the Constitution, R.T. Clark Co. are liable to the levee board for the excess paid them above the contract price. Clark v. Miller, 142 Miss. 123, 105 So. 502. And this is true regardless of whether or not R.T. Clark Co. had breached the contract. The levee board was without authority either to increase the contract price or to relet the contract to R.T. Clark Co. at a price above the contract price. *Page 265 
The result is that the decree of the court below is reversed as to the United States Fidelity Guaranty Company, for which judgment is rendered here, and affirmed as to R.T. Clark Co.
Reversed in part, and affirmed in part.