KNIGHT *v.* STATE

No. 42958 March 9, 1964 161 So. 2d 521

*Young & Hall, R. Jess Brown,* Jackson; *Jack Greenberg, Leroy D. Clark,* New York, N. Y., for appellant.

*Joe T. Patterson,* Attorney General, *J. A. Travis, Jr., Robt. G. Nichols, Jr.,* Jackson, for appellee.

LEE, C. J.

Pauline Edythe Knight was convicted by the Police Justice of the City of Jackson, acting as an ex-officio Justice of the Peace of Hinds County, Mississippi, of a violation of Section 2087.5, Code of 1942, Rec., being a charge of disorderly conduct. She appealed to the County Court of Hinds County where there was a trial de novo, resulting in a verdict of guilty as charged. Thereafter she appealed to the Circuit Court of Hinds County, where the judgment and sentence was affirmed. She has prosecuted her appeal to this Court.

Simply stated, the evidence was to the following effect: The date and occurrence of this alleged offense was about 1:30 P. M. on May 28, 1961, and the place was the Continental Trailways Bus Terminal in the City of Jackson. Captain J. L. Ray and a detail of other officers from the police department of the City were sent to the Terminal for the purpose of maintaining peace and order. They had advance notice, through police channels, that the defendant and others were coming to the City of Jackson for the purpose of creating an incident. The officers put in appearance at the Terminal prior to the arrival of the bus and had heard citizens of Jackson and Hinds County expressing themselves about the mission of such persons. The condition in and around the Terminal at that time was peaceful.

When the defendant and her group of seven others after disembarking from the bus, entered the west (white) waiting room of the Terminal, the mood of the fifty people, including some newspapermen, on the inside, immediately changed. It became "ugly and nasty". The people began to move in and toward the group. The officers saw expressions on the faces of the people and heard their talk about this crowd and their accusations that the group were a bunch of agitators and trouble makers. The defendant used no vulgar or indecent language and made no unusual gestures; but she ap-

peared to be afraid. At no time did she advise the officers that she had business in the waiting room, nor did she assert any claim that she was exercising her right of free speech or any other right.

Captain Ray, seeing the change in the attitude of the people, and deeming that the defendant and her group were the root of the trouble, and believing that, under the circumstances then existing, a breach of the peace was about to occur, twice ordered the defendant and the other members "to move on". When they refused, he arrested all of them.

The appellant has assigned and argued, in this case, the same alleged errors on the part of the trial court as were set out and argued in the case of Henry J. Thomas v. State, No. 42,987, decided by this Court on February 17, 1964, and not yet reported in the official reports. The opinion in that case deals with several questions and cites the authorities on which the affirmance of that case was rested. See also James L. Farmer v. State of Mississippi, No. 42,983, decided March 2, 1964, and likewise not yet reported.

The reasons set forth in those cases and the principles there enunciated also govern and control the decision in this case. A further feature of these cases will be commented upon hereafter.

On cross examination of a State witness, counsel for the defendant sought to establish the identification of the defendant by race, but the objection of the State was sustained by the court. The defendant's position was based on the Fourteenth Amendment to the Constitution of the United States and the objection should have been overruled.

██ █ Of course, the admission or exclusion of evidence must result in prejudice and harm, if a cause is to be reversed on that account. Rule 11 of the Revised Rules of the Supreme Court of Mississippi 1953. ██ █ Actually the record discloses that, immediately before

the State began the introduction of its evidence, the defendant was present and was arraigned and entered a plea of not guilty. Obviously the jury saw her at the time, and all during the trial, and could tell whether she was a white person or a Negro. Besides, after the State rested, counsel for the defendant, with the consent of the court, made the statement into the record, out of the presence of the jury, that the defendant was a Negro and that she went into the west waiting room of the Terminal, which was designated "white waiting room". In the first sentence of that brief, the appellant asserts: "The appellant was arrested on May 28, 1961, with a racially mixed group shortly after they entered the white waiting room of the Trailways Bus Terminal in Jackson, Mississippi."

In the Thomas case, supra, the opinion, in note 1, observed that this Court can take judicial notice of historical facts, and cited the following cases: Day v. Smith, 87 Miss. 395, 39 So. 526; Clark & Co. v. Miller, 154 Miss. 233, 122 So. 476; Moore v. Grillis, 205 Miss. 865, 39 So. 2d 505; 10 A.L.R. 2d 1425.

This Court, like everyone else, is somewhat conversant with historical facts. Hence it knows that slavery, as a legal institution, existed in this country from the earliest Colonial days. That status continued unabated even after the Declaration of Independence was proclaimed to the world in 1776 and thereafter beyond the adoption of the Constitution itself. As a matter of fact, it took a cruel and bloody civil war to uproot it from all sections of the country. Even after the newly freed slaves were enfranchised, there was little difference thereafter in the racial attitudes insofar as social intercourse and acceptance were concerned. Certain sections of the country, since the time when the memory of man runneth not to the contrary, because of physical traits and differences between the white and colored races and other disparities, real to them although perhaps imaginary to others,

observed and practiced segregation of the races. Even the Great Crusader for Freedom and the Emancipator of the Slaves recognized that these differences placed a severe limitation on the full measure of freedom for them. Separate schools, in many areas, were provided. But suddenly the equalitarian doctrine began to take root in the land and has apparently met with substantial acceptance in recent years. Within a decade novel constructions have nullified settled constitutional questions. Segregation in schools and in all means of public transportation has been declared at an end by judicial fiat. The cry by certain groups for conformity to their beliefs rings out endlessly over the land through the various media of communications. Large numbers of people, in this broad land, are steeped in their customs, practices, mores and traditions. In many instances, their beliefs go as deep or deeper than religion itself. If, in the lapse of time, these principles, sacred to them, shall be disproved, then it may be accepted that truth will prevail. But, until those principles have been tested in the crucible of time, no abject surrender should be expected, much less demanded. History shows that there has always been friction between different ethnic and religious groups in varying degrees. Compare the intense animosity which has existed between Jew and Arab, Greek and Turk, and Irish and English. From the lessons of history, it has been learned that "though the mills of the gods grind slowly, yet they grind exceeding small" and that human nature makes little change from day to day, month to month, year to year, and century to century.

 ██ In a free and civilized society, differences of opinion will arise, and freedom of expression must be permitted at proper times and in proper places. But a cardinal principle requires that the State must always have the power to take such measures as may be necessary to prevent violence among its disputant citizens. The Thomas case cites Feiner v. New York, 340 U. S.

315, 95 L. Ed. 295, 71 S. Ct. 303, a 1950 case, which affirmed a conviction of the defendant on a charge of disorderly conduct growing out of his inflammatory speech to an audience on the street in which there was an appeal and exhortation to racial prejudice. The opinion in the Thomas case pointed out the similarity of the New York statute to Section 2087.5 of the Miss. Code. It likewise cited the case of Bullock v. Tamiami Trail Tours Inc., 266 Fed. 2d 326, in which the United States Fifth Circuit Court of Appeals dealt with the measure of care devolving upon a bus driver toward his passengers, namely, a colored man and his "apparently white wife" while sitting together on the front seat of a bus in Florida. The opinion in that case by Judge Rives pointed out that the employees of the bus company should have notified these passengers of the segregation customs in the South. The opinion said in part: "We can visualize no stronger case than this to show a situation where two bus drivers and the bus company officials should have reasonably anticipated that mischief was hovering about and that the Bullocks were in some danger."

██ ██ This record, stripped down to the naked truth, established these facts: The authorities had advance notice that the defendant and others in a racially mixed group were coming to Jackson for the purpose of creating an incident. There were a substantial number of people in the white waiting room at the bus terminal and they were in a peaceable mood. When this group of Negroes and whites congregated in the white waiting room, the mood of the people changed quickly, the people gave evidence of hostility, and started toward them. The evidence showed that the officers believed that a breach of the peace was imminent. Is the officer helpless to do anything in order to avert violence? Can it be expected that he shall constitute himself as a magistrate, hold a hearing on the grounds, and decide the relative ques-

tions then existing? Anger and rage throttle reason; and, when reason is dethroned, force is the only answer. Governmental force must be empowered to prevent violence and bloodshed. Regardless of rights, none of which were then asserted, riots and bloodshed must be averted; otherwise anarchy will prevail within the country.

Affirmed.

All Justicers concur.