## CITY OF GREENWOOD v. PEACOCK ET AL.

No. 471. Argued April 26, 1966.—Decided June 20, 1966.*

---

*Together with No. 649, *Peacock et al.* v. *City of Greenwood,* also on certiorari to the same court.

*Hardy Lott* argued the cause for petitioner in No. 471 and for respondent in No. 649. With him on the briefs was *Aubrey H. Bell.*

*Benjamin E. Smith* argued the cause for respondents in No. 471 and for petitioners in No. 649. With him on the briefs were *William Rossmore, Fay Stender, Jack Peebles, Claudia Shropshire* and *George Crockett.*

*Louis F. Claiborne* argued the cause for the United States, as *amicus curiae,* by special leave of Court. With him on the brief were *Solicitor General Marshall, Assistant Attorney General Doar, David L. Norman* and *Louis M. Kauder.*

MR. JUSTICE STEWART delivered the opinion of the Court.

These consolidated cases, sequels to *Georgia* v. *Rachel, ante,* p. 780, involve prosecutions on various state criminal charges against 29 people who were allegedly engaged in the spring and summer of 1964 in civil rights activity in Leflore County, Mississippi. In the first case, 14 individuals were charged with obstructing the public streets of the City of Greenwood in violation of Mississippi law.[1] They filed petitions to remove their cases to the United States District Court for the Northern District of Mississippi under 28 U. S. C. § 1443 (1964 ed.).[2] Alleging

---

[1] The defendants were charged with violating paragraph one of § 2296.5 of the Mississippi Code (1964 Cum. Supp.), Laws 1960, c. 244, § 1, which provides:

"It shall be unlawful for any person or persons to wilfully obstruct the free, convenient and normal use of any public sidewalk, street, highway, alley, road, or other passageway by impeding, hindering, stifling, retarding or restraining traffic or passage thereon, and any person or persons violating the provisions of this act shall be guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not more than five hundred dollars ($500.00) or by confinement in the county jail not exceeding six (6) months, or by both such fine and imprisonment."

that they were members of a civil rights group engaged in a drive to encourage Negro voter registration in Leflore County, their petitions stated that they were denied or could not enforce in the courts of the State rights under laws providing for the equal civil rights of citizens of the United States, and that they were being prosecuted for acts done under color of authority of the Constitution of the United States and 42 U. S. C. § 1971 *et seq.* (1964 ed.).[3] Additionally, their removal petitions alleged that the statute under which they were charged was unconstitutionally vague on its face, that it was unconstitution-

civil rights of citizens of the United States, or of all persons within the jurisdiction thereof;

"(2) For any act under color of authority derived from any law providing for equal rights, or for refusing to do any act on the ground that it would be inconsistent with such law." 28 U. S. C. § 1443 (1964 ed.). See *Georgia* v. *Rachel, ante,* p. 780.

[3] The removal petitions specifically invoked rights to freedom of speech, petition, and assembly under the First and Fourteenth Amendments to the Constitution, as well as additional rights under the Equal Protection, Due Process, and Privileges and Immunities Clauses of the Fourteenth Amendment. 42 U. S. C. § 1971 (a)(1) (1964 ed.), which guarantees the right to vote, free from racial discrimination, provides:

"All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding."

42 U. S. C. § 1971 (b) (1964 ed.) provides:

"No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose . . . ."

See also § 11 (b) of the Voting Rights Act of 1965, 79 Stat. 443, 42 U. S. C. § 1973i (b) (1964 ed., Supp. I).

ally applied to their conduct, and that its application was a part of a policy of racial discrimination fostered by the State of Mississippi and the City of Greenwood. The District Court sustained the motion of the City of Greenwood to remand the cases to the city police court for trial. The Court of Appeals for the Fifth Circuit reversed, holding that "a good claim for removal under § 1443 (1) is stated by allegations that a state statute has been applied prior to trial so as to deprive an accused of his equal civil rights in that the arrest and charge under the statute were effected for reasons of racial discrimination." *Peacock* v. *City of Greenwood,* 347 F. 2d 679, 684. Accordingly, the cases were remanded to the District Court for a hearing on the truth of the defendants' allegations. At the same time, the Court of Appeals rejected the defendants' contentions under 28 U. S. C. § 1443 (2), holding that removal under that subsection is available only to those who have acted in an official or quasi-official capacity under a federal law and who can therefore be said to have acted under "color of authority" of the law within the meaning of that provision.[4]

In the second case, 15 people allegedly affiliated with a civil rights group were arrested at different times in July

---

[4] ". . . § 1443 (2) . . . is limited to federal officers and those assisting them or otherwise acting in an official or quasi-official capacity." *Peacock* v. *City of Greenwood,* 347 F. 2d 679, 686 (C. A. 5th Cir.). In reaching this conclusion, the Court of Appeals relied strongly on the decision of the District Court in *City of Clarksdale* v. *Gertge,* 237 F. Supp. 213 (D. C. N. D. Miss.). The Court of Appeals for the Fourth Circuit has also adopted this construction of § 1443 (2). *Baines* v. *City of Danville,* 357 F. 2d 756, 771–772. The Courts of Appeals for the Second and Third Circuits have refused to grant removal under § 1443 (2) on allegations comparable to those in the present case. *New York* v. *Galamison,* 342 F. 2d 255 (C. A. 2d Cir.); *City of Chester* v. *Anderson,* 347 F. 2d 823 (C. A. 3d Cir.). See also *Arkansas* v. *Howard,* 218 F. Supp. 626 (D. C. E. D. Ark.).

and August of 1964 and charged with various offenses against the laws of Mississippi or ordinances of the City of Greenwood.[5] These defendants filed essentially identical petitions for removal in the District Court, denying that they had engaged in any conduct prohibited by valid laws and stating that their arrests and prosecutions were for the "sole purpose and effect of harassing Petitioners and of punishing them for and deterring them from the exercise of their constitutionally protected right to protest the conditions of racial discrimination and segregation" in Mississippi. As grounds for removal, the defendants specifically invoked 28 U. S. C. §§ 1443 (1)[6] and 1443 (2).[7] The District Court held that the cases

[5] The several defendants were charged variously with assault, interfering with an officer in the performance of his duty, disturbing the peace, creating a disturbance in a public place, inciting to riot, parading without a permit, assault and battery by biting a police officer, contributing to the delinquency of a minor, operating a motor vehicle with improper license tags, reckless driving, and profanity and use of vulgar language.

[6] Under § 1443 (1), the defendants alleged that they had been denied and could not enforce in the courts of the State rights under laws providing for equal civil rights, in that the courts and law enforcement officers of the State were prejudiced against them because of their race or their association with Negroes, and because of the commitment of the courts and officers to the State's declared policy of racial segregation. The defendants also alleged that the trial would take place in a segregated courtroom, that Negro witnesses and attorneys would be addressed by their first names, that Negroes would be excluded from the juries, and that the judges and prosecutors who would participate in the trial had gained office at elections in which Negro voters were excluded. The defendants also urged that the statutes and ordinances under which they were charged were unconstitutionally vague on their face, and that the statutes and ordinances were unconstitutional as applied to the defendants' conduct.

[7] Under § 1443 (2), the defendants alleged that they had engaged solely in conduct protected by the First Amendment, by the Equal Protection, Due Process, and Privileges and Immunities Clauses of

had been improperly removed and remanded them to the police court of the City of Greenwood. In a *per curiam* opinion finding the issues "identical with" those determined in the *Peacock* case, the Court of Appeals for the Fifth Circuit reversed and remanded the cases to the District Court for a hearing on the truth of the defendants' allegations under § 1443 (1). *Weathers* v. *City of Greenwood,* 347 F. 2d 986.

We granted certiorari to consider the important questions raised by the parties concerning the scope of the civil rights removal statute. 382 U. S. 971.[8] As in *Georgia* v. *Rachel, ante,* p. 780, we deal here not with questions of congressional power, but with issues of statutory construction.

## I.

The individual petitioners contend that, quite apart from 28 U. S. C. § 1443 (1), they are entitled to remove their cases to the District Court under 28 U. S. C. § 1443 (2), which authorizes the removal of a civil action or criminal prosecution for "any act under color of authority derived from any law providing for equal rights . . . ." The core of their contention is that the various federal constitutional and statutory provisions invoked in their removal petitions conferred "color of authority" upon them to perform the acts for which they

---

the Fourteenth Amendment, and by 42 U. S. C. § 1981 (1964 ed.), which provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

[8] The City of Greenwood, petitioner in No. 471, challenges the Court of Appeals' interpretation of § 1443 (1); the individual petitioners in No. 649 challenge the court's interpretation of § 1443 (2).

are being prosecuted by the State. We reject this argument, because we have concluded that the history of § 1443 (2) demonstrates convincingly that this subsection of the removal statute is available only to federal officers and to persons assisting such officers in the performance of their official duties.[9]

The progenitor of § 1443 (2) was § 3 of the Civil Rights Act of 1866, 14 Stat. 27. Insofar as it is relevant here, that section granted removal of all criminal prosecutions "commenced in any State court . . . against any *officer,* civil or military, *or other person,* for any arrest or imprisonment, trespasses, or wrongs done or committed by virtue or under color of authority derived from this act or the act establishing a Bureau for the relief of Freedmen and Refugees, and all acts amendatory thereof . . . ." (Emphasis added.)

The statutory phrase "officer . . . or other person" characterizing the removal defendants in § 3 of the 1866 Act was carried forward without change through successive revisions of the removal statute until 1948, when the revisers, disavowing any substantive change, eliminated the phrase entirely.[10] The definition of the persons en-

---

[9] The provisions of what is now § 1443 (2) have never been construed by this Court during the century that has passed since the law's original enactment. The courts of appeals that have recently given consideration to the subsection have unanimously rejected the claims advanced in this case by the individual petitioners. See, in addition to the present case in the Fifth Circuit, 347 F. 2d 679, the following cases: *New York* v. *Galamison,* 342 F. 2d 255 (C. A. 2d Cir.); *City of Chester* v. *Anderson,* 347 F. 2d 823 (C. A. 3d Cir.); *Baines* v. *City of Danville,* 357 F. 2d 756 (C. A. 4th Cir.). See note 4, *supra.*

[10] See Rev. Stat. § 641 (1874); Judicial Code of 1911, c. 231, § 31, 36 Stat. 1096; 28 U. S. C. § 74 (1926 ed.); 28 U. S. C. § 1443 (1952 ed.). Although the 1948 revision modified the language of the prior provision in numerous respects, including the elimination of the phrase "officer . . . or other person," the reviser's note states

titled to removal under the present form of the statute is therefore appropriately to be read in the light of the more expansive language of the statute's ancestor. See *Madruga* v. *Superior Court,* 346 U. S. 556, 560, n. 12; *Fourco Glass Co.* v. *Transmirra Products Corp.,* 353 U. S. 222, 227–228.

In the context of its original enactment as part of § 3 of the Civil Rights Act of 1866, the statutory language "officer . . . or other person" points squarely to the conclusion that the phrase "or other person" meant persons acting in association with the civil or military officers mentioned in the immediately preceding words of the statute. That interpretation stems from the obvious contrast between the "officer . . . or other person" phrase and the next preceding portion of the statute, the predecessor of the present § 1443 (1), which granted removal to "any . . . person" who was denied or could not enforce in the courts of the State his rights under § 1 of the 1866 Act. The dichotomy between "officer . . . or other person" and "any . . . person" in these correlative removal provisions persisted through successive statutory revisions until 1948, even though, were we to accept the individual petitioners' contentions, the two phrases would in fact have been almost entirely co-extensive.

It is clear that the "other person" in the "officer . . . or other person" formula of § 3 of the Civil Rights Act of 1866 was intended as an obvious reference to certain categories of persons described in the enforcement provisions, §§ 4–7, of the Act. 14 Stat. 28–29. Section 4 of the Act specifically charged both the officers

---

simply that "Changes were made in phraseology." H. R. Rep. No. 308, 80th Cong., 1st Sess., p. A134. The statutory development of the civil rights removal provision is set out in the Appendix to the Court's opinion in *Georgia* v. *Rachel, ante.*

and the agents of the Freedmen's Bureau,[11] among others, with the duty of enforcing the Civil Rights Act. As such, those officers and agents were required to arrest and institute proceedings against persons charged with vio-

---

[11] By the Act of March 3, 1865, 13 Stat. 507, Congress established a Bureau under the War Department, to last during the rebellion and for one year thereafter, to assist refugees and freedmen from rebel states and other areas by providing food, shelter, and clothing. The Bureau was under the direction of a commissioner appointed by the President with the consent of the Senate. Under § 4 of the Act, the commissioner was authorized to set apart for loyal refugees and freedmen up to 40 acres of lands that had been abandoned in the rebel states or that had been acquired by the United States by confiscation or sale. The section specifically provided that persons assigned to such lands "shall be protected in the use and enjoyment of the land." 13 Stat. 508. The Act was continued for two years by the Act of July 16, 1866, c. 200, § 1, 14 Stat. 173. In addition, § 3 of the latter Act amended the 1865 Act to authorize the commissioner to "appoint such agents, clerks, and assistants as may be required for the proper conduct of the bureau." The section also provided that military officers or enlisted men might be detailed for service and assigned to duty under the Act. 14 Stat. 174. Further, § 13 of the amendatory Act of 1866 specifically provided that "the commissioner of this bureau shall at all times co-operate with private benevolent associations of citizens in aid of freedmen, and with agents and teachers, duly accredited and appointed by them, and shall hire or provide by lease buildings for purposes of education whenever such associations shall, without cost to the government, provide suitable teachers and means of instruction; and he shall furnish such protection as may be required for the safe conduct of such schools." 14 Stat. 176. Section 14 of the amendatory Act of 1866 established, in essentially the same terms for States where the ordinary course of judicial proceedings had been interrupted by the rebellion, the rights and obligations that had already been enacted in § 1 of the Act of April 9, 1866 (the Civil Rights Act), and provided for the extension of military jurisdiction to those States in order to protect the rights secured. 14 Stat. 176–177. By the Act of July 6, 1868, 15 Stat. 83, the Freedmen's Bureau legislation was continued for an additional year.

lations of the Act.[12] By the "color of authority" removal provision of § 3 of the Civil Rights Act, "agents" who derived their authority from the Freedmen's Bureau legislation would be entitled as "other persons," if not as "officers," to removal of state prosecutions against them based upon their enforcement activities under both the Freedmen's Bureau legislation and the Civil Rights Act.[13] Section 5 of the Civil Rights Act, now 42 U. S. C. § 1989 (1964 ed.), specifically authorized United States commissioners to appoint "one or more suitable persons" to execute warrants and other process issued by the commissioners.[14] These "suitable persons" were, in turn, spe-

---

[12] "SEC. 4. *And be it further enacted,* That . . . the officers and agents of the Freedmen's Bureau . . . shall be, and they are hereby, specially authorized and required, at the expense of the United States, to institute proceedings against all and every person who shall violate the provisions of this act, and cause him or them to be arrested and imprisoned, or bailed, as the case may be, for trial before [the circuit] court of the United States or territorial court as by this act has cognizance of the offence." Act of April 9, 1866, 14 Stat. 28.

The same authorization was extended to district attorneys, marshals, and deputy marshals of the United States, and to commissioners appointed by the circuit and territorial courts of the United States. In order to expedite the enforcement of the Act, § 4 also authorized the circuit courts of the United States and superior territorial courts to increase the number of commissioners charged with the duties of enforcing the Act.

[13] Section 3 of the Civil Rights Act of 1866 provided for removal by any "officer . . . or other person" for acts under color of authority derived either from the Act itself or from the Freedmen's Bureau legislation. See p. 815, *supra.* Thus, removal was granted to officers and agents of the Freedmen's Bureau for enforcement activity under both Acts. The Civil Rights Act, however, made no specific provision for removal of actions against freedmen and refugees who had been awarded abandoned or confiscated lands under § 4 of the Freedmen's Bureau Act. See note 11, *supra.*

[14] Section 5 also provided that, "should any marshal or deputy marshal refuse to receive such warrant or other process when

cifically authorized "to summon and call to their aid the bystanders or posse comitatus of the proper county." [15] Section 6 of the Act provided criminal penalties for any individual who obstructed "any officer, or other person charged with the execution of any warrant or process issued under the provisions of this act, or any person or persons lawfully assisting him or them," or who rescued

---

tendered, or to use all proper means diligently to execute the same, he shall, on conviction thereof, be fined in the sum of one thousand dollars, to the use of the person upon whom the accused is alleged to have committed the offence." 14 Stat. 28. The Civil Rights Act of 1866 was passed over the veto of President Johnson. Because of the hostility between Congress and the President, it was feared that the United States marshals, who were appointed by the President, would not enforce the law. In § 5, therefore, Congress provided severe penalties for recalcitrant marshals. At the same time Congress ensured the availability of process servers by providing for the appointment by the commissioners of other "suitable persons" for the task of enforcing the new Act. Cf. *In re Upchurch*, 38 F. 25, 27 (C. C. E. D. N. C.).

[15] Section 5 of the Civil Rights Act of 1866 provided:

". . . And the better to enable the said commissioners to execute their duties faithfully and efficiently, in conformity with the Constitution of the United States and the requirements of this act, they are hereby authorized and empowered, within their counties respectively, to appoint, in writing, under their hands, any one or more suitable persons, from time to time, to execute all such warrants and other process as may be issued by them in the lawful performance of their respective duties; and the persons so appointed to execute any warrant or process as aforesaid shall have authority to summon and call to their aid the bystanders or posse comitatus of the proper county, or such portion of the land or naval forces of the United States, or of the militia, as may be necessary to the performance of the duty with which they are charged, and to insure a faithful observance of the clause of the Constitution which prohibits slavery, in conformity with the provisions of this act; and said warrants shall run and be executed by said officers anywhere in the State or Territory within which they are issued." Act of April 9, 1866, 14 Stat. 28. Cf. *Davis* v. *South Carolina*, 107 U. S. 597, 600.

or attempted to rescue prisoners "from the custody of the officer, other person or persons, or those lawfully assisting." [16] Finally, § 7 of the Act, now 42 U. S. C. § 1991 (1964 ed.), awarded a fee of five dollars for each individual arrested by the "person or persons authorized to execute the process"—*i. e.*, the "one or more suitable persons" of § 5. Thus, the enforcement provisions of the 1866 Act were replete with references to "other persons" in contexts obviously relating to positive enforcement activity under the Act.[17]

---

[16] This aspect of § 6 thus draws a threefold distinction: "officers," "other persons" (probably the "one or more suitable persons" referred to in § 5), and those "lawfully assisting" them. We have no doubt that the general "officer . . . or other person" language in § 3 of the Act comprehended all three of these categories.

[17] "It thus appears that the statute contemplated that literally thousands of persons would be drawn into its enforcement and that some of them otherwise would have little or no appearance of official authority." *Baines* v. *City of Danville,* 357 F. 2d 756, 760 (C. A. 4th Cir.). No support for the proposition that "other person" includes private individuals not acting in association with federal officers can be drawn from the fact that the "color of authority" provision of the Civil Rights Act of 1866 was carried forward together with the "denied or cannot enforce" provision as § 641 of the Revised Statutes of 1874, whereas other removal provisions applicable to federal officers and persons assisting them were carried forward in § 643. Prior to 1948 the federal officer removal statute, as here relevant, was limited to revenue officers engaged in the enforcement of the criminal or revenue laws. The provision was expanded in 1948 to encompass all federal officers. See 28 U. S. C. § 1442 (a)(1) (1964 ed.). At the present time, all state suits or prosecutions against "Any officer of the United States . . . or person acting under him, for any act under color of such office" may be removed. Thus many, if not all, of the cases presently removable under § 1443 (2) would now also be removable under § 1442 (a)(1). The present overlap between the provisions simply reflects the separate historical evolution of the removal provision for officers in civil rights legislation. Indeed, there appears to be redundancy even within § 1442 (a)(1) itself. See Wechsler, Federal Jurisdiction and

The derivation of the statutory phrase "For any act" in § 1443 (2) confirms the interpretation that removal under this subsection is limited to federal officers and those acting under them. The phrase "For any act" was substituted in 1948 for the phrase "for any arrest or imprisonment or other trespasses or wrongs." Like the "officer . . . or other person" provision, the language specifying the acts on which removal could be grounded had, with minor changes, persisted until 1948 in the civil rights removal statute since its original introduction in the 1866 Act. The language of the original Civil Rights Act—"arrest or imprisonment, trespasses, or wrongs"—is pre-eminently the language of enforcement. The

the Revision of the Judicial Code, 13 Law & Contemp. Prob. 216, 221, n. 18 (1948).

The limitation of 28 U. S. C. § 1443 (2) to official enforcement activity under federal equal civil rights laws draws support from analogous provisions in the removal statutes available to federal revenue officers. Long before 1866, federal statutes had guaranteed certain federal revenue officers the right to remove to the federal court state court proceedings instituted against them because of their official actions. These statutes characteristically used the "officer . . . or other person" formula in defining those entitled to the benefit of removal. The Customs Act of 1815, the primordial officer removal statute, described the "other person" as one "aiding or assisting" the revenue officer. Act of Feb. 4, 1815, c. 31, § 8, 3 Stat. 198. See also the Act of March 3, 1815, c. 94, § 6, 3 Stat. 233. The removal clause of a subsequent statute, the Force Act of 1833, was less specific with regard to the scope of the "other person" language, but it focused upon the possibility that persons other than federal officers or their deputies might find themselves faced with the prospect of defending titles claimed under the federal revenue laws against suits or prosecutions in state courts. Act of March 2, 1833, c. 57, § 3, 4 Stat. 633. Thus, when Congress desired to grant removal of suits and prosecutions against private individuals, it knew how to make specific provision for it. Cf. Act of Jan. 22, 1869, 15 Stat. 267 (Habeas Corpus Suspension Act of 1863, 12 Stat. 755, amended to permit removal of suits or prosecutions against carriers for losses caused by rebel or Union forces).

words themselves denote the very sorts of activity for which federal officers, seeking to enforce the broad guarantees of the 1866 Act, were likely to be prosecuted in the state courts. As the Court of Appeals for the Second Circuit has put it, " 'Arrest or imprisonment, trespasses, or wrongs,' were precisely the probable charges against enforcement officers and those assisting them; and a statute speaking of such acts 'done or committed by virtue of or under color of authority derived from' specified laws reads far more readily on persons engaged in some sort of enforcement than on those whose rights were being enforced . . . ." *New York* v. *Galamison,* 342 F. 2d 255, 262.

The language of the "color of authority" removal provision of § 3 of the Civil Rights Act of 1866 was taken directly from the Habeas Corpus Suspension Act of 1863, 12 Stat. 755, which authorized the President to suspend the writ of habeas corpus and precluded civil and criminal liability of any person making a search, seizure, arrest, or imprisonment under any order of the President during the rebellion.[18] Section 5 of the 1863 Act provided for the removal of all suits or prosecutions "against any officer, civil or military, or against any other person, for any arrest or imprisonment made, or other trespasses or wrongs done or committed, or any act omitted to be done, at any time during the present rebellion, by virtue or under color of any authority derived from or exercised by or under the President of the United States, or any Act of Congress." 12 Stat. 756. See *The Mayor* v. *Cooper,* 6 Wall. 247; *Phillips* v. *Gaines,* 131 U. S. App. clxix. Since the 1863 Act granted no rights to private individuals, its removal provision was concerned solely with the protection of federal officers and persons acting

---

[18] Act of March 3, 1863, c. 81, §§ 1, 4, 12 Stat. 755, 756. See also the amendatory Act of May 11, 1866, 14 Stat. 46.

under them in the performance of their official duties.[19] Thus, at the same time that Congress expanded the availability of removal by enacting the "denied or cannot enforce" clause in § 3 of the Civil Rights Act of 1866, it repeated almost verbatim in the "color of authority" clause the language of the 1863 Act [20]—language that was clearly limited to enforcement activity by federal officers and those acting under them.[21]

---

[19] The provision in § 5 of the Act of March 3, 1863, specifically extending removal to criminal as well as civil proceedings, was added on the Senate floor. Cong. Globe, 37th Cong., 3d Sess., 538. The debates focused on the need to protect federal officers against state criminal prosecutions. See, e. g., id., at 535 (remarks of Senator Clark); id., at 537–538 (remarks of Senator Cowan).

[20] Although, in the revenue officer removal provision of the Revenue Act of 1866, Act of July 13, c. 184, § 67, 14 Stat. 171, Congress expressly characterized the "other person" as one "acting under or by authority of any [revenue] officer," that statute obviously drew on the comparable characterization of the "other person" in the Customs Act of 1815, supra, note 17. And the "title" clause included in the 1866 revenue officer removal provision was obviously derived from the Force Act of 1833, supra, note 17. Thus, the same legislative inertia that led the Reconstruction Congress not to qualify "other person" in the Civil Rights Act of 1866 also led it to retain such a qualification in the revenue officer removal provision enacted later the same year. Compare § 16 of the Act of February 28, 1871, 16 Stat. 438 ("title" clause included in the officer removal provision of a civil rights statute). Cf. City of Philadelphia v. The Collector, 5 Wall. 720; The Assessor v. Osbornes, 9 Wall. 567.

[21] The language "arrest or imprisonment, trespasses, or wrongs" is, of course, easily read as describing the full range of enforcement activities in which federal officers might be engaged under the Civil Rights Act. In a case arising under § 5 of the Habeas Corpus Suspension Act of 1863, this Court disallowed removal of an action of ejectment brought in a Virginia state court by the heir of a Confederate naval officer whose land had been seized under the Confiscation Act of July 17, 1862, 12 Stat. 589. The confiscated land had been sold at public auction, and the rights to the land subsequently vested in a man named Bigelow, against whom the action of ejectment was

For these reasons, we hold that the second subsection of § 1443 confers a privilege of removal only upon federal officers or agents and those authorized to act with or for them in affirmatively executing duties under any federal law providing for equal civil rights.[22] Accordingly, the individual petitioners in the case before us had no right of removal to the federal court under 28 U. S. C. § 1443 (2).

## II.

We come, then, to the issues which this case raises as to the scope of 28 U. S. C. § 1443 (1). In *Georgia* v. *Rachel*, decided today, we have held that removal of a state court trespass prosecution can be had under § 1443 (1) upon a petition alleging that the prosecution stems exclusively from the petitioners' peaceful exercise of their right to equal accommodation in establishments covered by the Civil Rights Act of 1964, § 201, 78 Stat. 243, 42 U. S. C. § 2000a (1964 ed.). Since that Act

---

brought. In denying removal under § 5 of the 1863 Act, Mr. Justice Strong for a unanimous Court stated, "The specification [in § 5] of arrests and imprisonments . . . followed by more general words, justifies the inference that the other trespasses and wrongs mentioned are trespasses and wrongs *ejusdem generis,* or of the same nature as those which had been previously specified." *Bigelow* v. *Forrest,* 9 Wall. 339, 348–349.

[22] The second phrase of 28 U. S. C. § 1443 (2), "for refusing to do any act on the ground that it would be inconsistent with such law," has no relevance to this case. It is clear that removal under that language is available only to state officers. The phrase was added by the House of Representatives as an amendment to the Senate bill during the debates on the Civil Rights Act of 1866. In reporting the House bill, Representative Wilson, the chairman of the House Judiciary Committee and the floor manager of the bill, said, "I will state that this amendment is intended to enable State officers, who shall refuse to enforce State laws discriminating in reference to [the rights created by § 1 of the bill] on account of race or color, to remove their cases to the United States courts when prosecuted for refusing to enforce those laws." Cong. Globe, 39th Cong., 1st Sess., 1367.

itself, as construed by this Court in *Hamm* v. *City of Rock Hill,* 379 U. S. 306, 310, specifically and uniquely guarantees that the conduct alleged in the removal petition in *Rachel* may "not be the subject of trespass prosecutions," the defendants inevitably are "denied or cannot enforce in the courts of [the] State a right under any law providing for . . . equal civil rights," by merely being brought before a state court to defend such a prosecution. The present case, however, is far different.

In the first place, the federal rights invoked by the individual petitioners include some that clearly cannot qualify under the statutory definition as rights under laws providing for "equal civil rights." The First Amendment rights of free expression, for example, so heavily relied upon in the removal petitions, are not rights arising under a law providing for "equal civil rights" within the meaning of § 1443 (1). The First Amendment is a great charter of American freedom, and the precious rights of personal liberty it protects are undoubtedly comprehended in the concept of "civil rights." Cf. *Hague* v. *C. I. O.,* 307 U. S. 496, 531–532 (separate opinion of Stone, J.). But the reference in § 1443 (1) is to *"equal* civil rights." That phrase, as our review in *Rachel* of its legislative history makes clear, does not include the broad constitutional guarantees of the First Amendment.[23] A precise definition of the limitations of the phrase "any law providing for . . . equal civil rights" in § 1443 (1) is not a matter we need pursue to a conclusion, however, because we may proceed here on the premise that at least the two federal statutes specifically referred to in the removal petitions, 42 U. S. C. § 1971 and 42 U. S. C. § 1981, do qualify under the statutory definition.[24]

---

[23] See *Georgia* v. *Rachel, ante,* at 788–792. See also *New York* v. *Galamison,* 342 F. 2d 255, 266–268 (C. A. 2d Cir.).

[24] See note 3 and note 7, *supra.*

The fundamental claim in this case, then, is that a case for removal is made under § 1443 (1) upon a petition alleging: (1) that the defendants were arrested by state officers and charged with various offenses under state law because they were Negroes or because they were engaged in helping Negroes assert their rights under federal equal civil rights laws, and that they are completely innocent of the charges against them, or (2) that the defendants will be unable to obtain a fair trial in the state court. The basic difference between this case and *Rachel* is thus immediately apparent. In *Rachel* the defendants relied on the specific provisions of a preemptive federal civil rights law—§§ 201 (a) and 203 (c) of the Civil Rights Act of 1964, 42 U. S. C. §§ 2000a (a) and 2000a–2 (c) (1964 ed.), as construed in *Hamm* v. *City of Rock Hill, supra*—that, under the conditions alleged, gave them: (1) the federal statutory right to remain on the property of a restaurant proprietor after being ordered to leave, despite a state law making it a criminal offense not to leave, and (2) the further federal statutory right that no State should even attempt to prosecute them for their conduct. The Civil Rights Act of 1964 as construed in *Hamm* thus specifically and uniquely conferred upon the defendants an absolute right to "violate" the explicit terms of the state criminal trespass law with impunity under the conditions alleged in the *Rachel* removal petition, and any attempt by the State to make them answer in a court for this conceded "violation" would directly deny their federal right "in the courts of [the] State." The present case differs from *Rachel* in two significant respects. First, no federal law confers an absolute right on private citizens—on civil rights advocates, on Negroes, or on anybody else—to obstruct a public street, to contribute to the delinquency of a minor, to drive an automobile without a license, or to bite a

policeman. Second, no federal law confers immunity from state prosecution on such charges.[25]

To sustain removal of these prosecutions to a federal court upon the allegations of the petitions in this case would therefore mark a complete departure from the terms of the removal statute, which allow removal only when a person is "denied or cannot enforce" a specified federal right "in the courts of [the] State," and a complete departure as well from the consistent line of this Court's decisions from *Strauder* v. *West Virginia,* 100 U. S. 303, to *Kentucky* v. *Powers,* 201 U. S. 1.[26] Those cases all stand for at least one basic proposition: It is *not* enough to support removal under § 1443 (1) to allege or show that the defendant's federal equal civil rights have been illegally and corruptly denied by state administrative officials in advance of trial, that the charges against the defendant are false, or that the defendant is unable to obtain a fair trial in a particular state court. The motives of the officers bringing the charges may be corrupt, but that does not show that the state trial court will find the defendant guilty if he is innocent, or that in any other manner the defendant will

---

[25] Section 203 (c) of the Civil Rights Act of 1964, 42 U. S. C. § 2000a–2 (c) (1964 ed.), the provision involved in *Hamm* v. *City of Rock Hill,* 379 U. S. 306, 310, and *Georgia* v. *Rachel, ante,* at 793–794, 804–805, explicitly provides that no person shall "punish or attempt to punish any person for exercising or attempting to exercise any right or privilege" secured by the public accommodations section of the Act. None of the federal statutes invoked by the defendants in the present case contains any such provision. See note 3 and note 7, *supra.*

[26] See also *Virginia* v. *Rives,* 100 U. S. 313; *Neal* v. *Delaware,* 103 U. S. 370; *Bush* v. *Kentucky,* 107 U. S. 110; *Gibson* v. *Mississippi,* 162 U. S. 565; *Smith* v. *Mississippi,* 162 U. S. 592; *Murray* v. *Louisiana,* 163 U. S. 101; *Williams* v. *Mississippi,* 170 U. S. 213; *Dubuclet* v. *Louisiana,* 103 U. S. 550; *Schmidt* v. *Cobb,* 119 U. S. 286. Cf. *Georgia* v. *Rachel, ante,* at 797 *et seq.*

be "denied or cannot enforce in the courts" of the State any right under a federal law providing for equal civil rights. The civil rights removal statute does not require and does not permit the judges of the federal courts to put their brethren of the state judiciary on trial. Under § 1443 (1), the vindication of the defendant's federal rights is left to the state courts except in the rare situations where it can be clearly predicted by reason of the operation of a pervasive and explicit state or federal law that those rights will inevitably be denied by the very act of bringing the defendant to trial in the state court. *Georgia* v. *Rachel, ante; Strauder* v. *West Virginia,* 100 U. S. 303.

What we have said is not for one moment to suggest that the individual petitioners in this case have not alleged a denial of rights guaranteed to them under federal law. If, as they allege, they are being prosecuted on baseless charges solely because of their race, then there has been an outrageous denial of their federal rights, and the federal courts are far from powerless to redress the wrongs done to them. The most obvious remedy is the traditional one emphasized in the line of cases from *Virginia* v. *Rives,* 100 U. S. 313, to *Kentucky* v. *Powers,* 201 U. S. 1—vindication of their federal claims on direct review by this Court, if those claims have not been vindicated by the trial or reviewing courts of the State. That is precisely what happened in two of the cases in the *Rives-Powers* line of decisions, where removal under the predecessor of § 1443 (1) was held to be unauthorized, but where the state court convictions were overturned because of a denial of the defendants' federal rights at their trials.[27] That is precisely what has happened in

[27] *Neal* v. *Delaware,* 103 U. S. 370; *Bush* v. *Kentucky,* 107 U. S. 110.

countless cases this Court has reviewed over the years—
cases like *Shuttlesworth* v. *Birmingham,* 382 U. S. 87,
to name one at random decided in the present Term.
"Cases where Negroes are prosecuted and convicted in
state courts can find their way expeditiously to this
Court, provided they present constitutional questions."
*England* v. *Medical Examiners,* 375 U. S. 411, 434
(DOUGLAS, J., concurring).

But there are many other remedies available in the
federal courts to redress the wrongs claimed by the
individual petitioners in the extraordinary circumstances
they allege in their removal petitions. If the state prose-
cution or trial on the charge of obstructing a public street
or on any other charge would itself clearly deny their
rights protected by the First Amendment, they may
under some circumstances obtain an injunction in the
federal court. See *Dombrowski* v. *Pfister,* 380 U. S. 479.
If they go to trial and there is a complete absence of evi-
dence against them, their convictions will be set aside
because of a denial of due process of law. *Thompson* v.
*Louisville,* 362 U. S. 199. If at their trial they are in
fact denied any federal constitutional rights, and these
denials go uncorrected by other courts of the State, the
remedy of federal habeas corpus is freely available to
them. *Fay* v. *Noia,* 372 U. S. 391. If their federal
claims at trial have been denied through an unfair or
deficient fact-finding process, that, too, can be corrected
by a federal court. *Townsend* v. *Sain,* 372 U. S. 293.

Other sanctions, civil and criminal, are available in the
federal courts against officers of a State who violate
the petitioners' federal constitutional and statutory
rights. Under 42 U. S. C. § 1983 (1964 ed.) the officers
may be made to respond in damages not only for viola-
tions of rights conferred by federal equal civil rights
laws, but for violations of other federal constitutional and

statutory rights as well.[28] *Monroe* v. *Pape,* 365 U. S. 167. And only this Term we have held that the provisions of 18 U. S. C. § 241 (1964 ed.), a criminal law that imposes punishment of up to 10 years in prison, may be invoked against those who conspire to deprive any citizen of the "free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States" by "causing the arrest of Negroes by means of false reports that such Negroes had committed criminal acts." [29] *United States* v. *Guest,* 383 U. S. 745, 756.

---

[28] *"Civil action for deprivation of rights.*

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U. S. C. § 1983 (1964 ed.).

[29] *"Conspiracy against rights of citizens.*

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

"If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

"They shall be fined not more than $5,000 or imprisoned not more than ten years, or both." 18 U. S. C. § 241 (1964 ed.).

Criminal penalties for violations of federal rights are also imposed by 18 U. S. C. § 242 (1964 ed.), which provides:

*"Deprivation of rights under color of law.*

"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than

But the question before us now is not whether state officials in Mississippi have engaged in conduct for which they may be civilly or criminally liable under federal law. The question, precisely, is whether the individual petitioners are entitled to remove these state prosecutions to a federal court under the provisions of 28 U. S. C. § 1443 (1). Unless the words of this removal statute are to be disregarded and the previous consistent decisions of this Court completely repudiated, the answer must clearly be that no removal is authorized in this case. In the *Rachel* case, decided today, we have traced the course of those decisions against the historic background of the statute they were called upon to interpret. And in *Rachel* we have concluded that removal to the federal court in the narrow circumstances there presented would not be a departure from the teaching of this Court's decisions, because the Civil Rights Act of 1964, in those narrow circumstances, "substitutes a right for a crime." *Hamm* v. *City of Rock Hill,* 379 U. S. 306, 315.

We need not and do not necessarily approve or adopt all the language and all the reasoning of every one of this Court's opinions construing this removal statute, from *Strauder* v. *West Virginia,* 100 U. S. 303, to *Kentucky* v. *Powers,* 201 U. S. 1. But we decline to repudiate those decisions, and we decline to do so not out of a blind adherence to the principle of *stare decisis,* but because after independent consideration we have determined, for the reasons expressed in this opinion and in *Rachel,* that those decisions were correct in their basic conclusion that the provisions of § 1443 (1) do not operate to work a wholesale dislocation of the historic relationship between the state and the federal courts in the administration of the criminal law.

---

are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both." See *United States* v. *Price,* 383 U. S. 787.

It is worth contemplating what the result would be if the strained interpretation of § 1443 (1) urged by the individual petitioners were to prevail. In the fiscal year 1963 there were 14 criminal removal cases of all kinds in the entire Nation; in fiscal 1964 there were 43. The present case was decided by the Court of Appeals for the Fifth Circuit on June 22, 1965, just before the end of the fiscal year. In that year, fiscal 1965, there were 1,079 criminal removal cases in the Fifth Circuit alone.[30] But this phenomenal increase is no more than a drop in the bucket of what could reasonably be expected in the future. For if the individual petitioners should prevail in their interpretation of § 1443 (1), then every criminal case in every court of every State—on any charge from a five-dollar misdemeanor to first-degree murder—would be removable to a federal court upon a petition alleging (1) that the defendant was being prosecuted because of his race[31] and that he was completely innocent of the charge brought against him, or (2) that he would be unable to obtain a fair trial in the state court. On motion to remand, the federal court would be required in every case to hold a hearing, which would amount to at least a preliminary trial of the motivations of the state officers who arrested and charged the defendant, of the quality of the state court or judge before whom the charges were filed, and of the defendant's innocence or guilt. And the federal court might, of course, be located hundreds of miles away from the place where the charge was brought. This hearing could be followed either by a full trial in the federal court, or by a remand order. Every remand order would be

---

[30] Annual Report of the Director of the Administrative Office of the United States Courts 214, 216 (1965). See *Georgia* v. *Rachel, ante,* p. 788, n. 8.

[31] Such removal petitions could, of course, be filed not only by Negroes, but also by members of the Caucasian or any other race.

appealable as of right to a United States Court of Appeals and, if affirmed there, would then be reviewable by petition for a writ of certiorari in this Court. If the remand order were eventually affirmed, there might, if the witnesses were still available, finally be a trial in the state court, months or years after the original charge was brought. If the remand order were eventually reversed, there might finally be a trial in the federal court, also months or years after the original charge was brought.

We have no doubt that Congress, if it chose, could provide for exactly such a system. We may assume that Congress has constitutional power to provide that all federal issues be tried in the federal courts, that all be tried in the courts of the States, or that jurisdiction of such issues be shared.[32] And in the exercise of that power, we may assume that Congress is constitutionally fully free to establish the conditions under which civil or criminal proceedings involving federal issues may be removed from one court to another.[33]

But before establishing the regime the individual petitioners propose, Congress would no doubt fully consider many questions. The Court of Appeals for the Fourth Circuit has mentioned some of the practical questions that would be involved: "If the removal jurisdiction is

---

[32] See *Romero* v. *International Terminal Operating Co.,* 358 U. S. 354, 359–380; 389–412 (separate opinion of MR. JUSTICE BRENNAN).

[33] See *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 348–350; *The Moses Taylor,* 4 Wall. 411, 428–430; *The Mayor* v. *Cooper,* 6 Wall. 247, 251–254; *Railway Co.* v. *Whitton,* 13 Wall. 270, 287–290; *Tennessee* v. *Davis,* 100 U. S. 257, 262–271; *Strauder* v. *West Virginia,* 100 U. S. 303, 310–312. A number of bills enlarging the right of removal to a federal court in civil rights cases are before the present Congress. See, for example: S. 2923, S. 3170, H. R. 12807, H. R. 12818, H. R. 12845, H. R. 13500, H. R. 13941, H. R. 14112, H. R. 14113, H. R. 14770, H. R. 14775, H. R. 14836 (89th Cong., 2d Sess.).

to be expanded and federal courts are to try offenses against state laws, cases not originally cognizable in the federal courts, what law is to govern, who is to prosecute, under what law is a convicted defendant to be sentenced and to whose institution is he to be committed . . . ?" *Baines* v. *City of Danville*, 357 F. 2d 756, 768–769. To these questions there surely should be added the very practical inquiry as to how many hundreds of new federal judges and other federal court personnel would have to be added in order to cope with the vastly increased caseload that would be produced.

We need not attempt to catalog the issues of policy that Congress might feel called upon to consider before making such an extreme change in the removal statute. But prominent among those issues, obviously, would be at least two fundamental questions: Has the historic practice of holding state criminal trials in state courts— with power of ultimate review of any federal questions in this Court—been such a failure that the relationship of the state and federal courts should now be revolutionized? Will increased responsibility of the state courts in the area of federal civil rights be promoted and encouraged by denying those courts any power at all to exercise that responsibility?

We postulate these grave questions of practice and policy only to point out that if changes are to be made in the long-settled interpretation of the provisions of this century-old removal statute, it is for Congress and not for this Court to make them. Fully aware of the established meaning the removal statute had been given by a consistent series of decisions in this Court, Congress in 1964 declined to act on proposals to amend the law.[34]

---

[34] Section 903 of H. R. 7702, 88th Cong., 1st Sess., would have amended 28 U. S. C. § 1443 to enlarge the availability of removal in civil rights cases. H. R. 7702, however, did not emerge from the Judiciary Committee of the House of Representatives. Cf. *Georgia* v. *Rachel, ante,* p. 787, n. 7.

All that Congress did was to make remand orders appealable, and thus invite a contemporary judicial consideration of the meaning of the unchanged provisions of 28 U. S. C. § 1443. We have accepted that invitation and have fully considered the language and history of those provisions. Having done so, we find that § 1443 does not justify removal of these state criminal prosecutions to a federal court. Accordingly the judgment of the Court of Appeals is reversed.

*It is so ordered.*

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE, MR. JUSTICE BRENNAN and MR. JUSTICE FORTAS concur, dissenting.

These state court defendants who seek the protection of the federal court were civil rights workers in Mississippi. Some were affiliated with the Student Non-Violent Coordinating Committee engaged in getting Negroes registered as voters. They were charged in the state courts with obstructing the public streets. Other defendants were civil rights workers affiliated with the Council of Federated Organizations which aims to achieve full and complete integration of Negroes into the political and economic life of Mississippi. Some alleged that, while peacefully picketing, they were arrested and charged with assault and battery or interfering with an officer. Others were charged with illegal operation of motor vehicles, or for contributing to the delinquency of a minor or parading without a permit. Some were charged with disturbing the peace or inciting a riot.

All sought removal, some alleging in their motions that the state prosecution was part and parcel of Mississippi's policy of racial segregation. Others alleged that they were wholly innocent, the state prosecutions being for the sole purpose of harassing them and of punishing them for exercising their constitutional rights

to protest the conditions of racial discrimination and segregation. In all these cases the District Court remanded to the state courts. The Court of Appeals reversed (347 F. 2d 679; 347 F. 2d 986) holding that the allegations were sufficient to make out a case for removal and that hearings on the truth of the allegations were required.

I agree with that result. As I will show, the federal regime was designed from the beginning to afford some protection against local passions and prejudices by the important pretrial federal remedy of removal; and the civil rights legislation with which we deal supports the mandates of the Court of Appeals.

## I.

The Federal District Courts were created by the First Congress (1 Stat. 73) which designated a few heads of jurisdiction for the District Courts (§ 9) and for the Circuit Courts (§ 11)—some being concurrent with those of the state courts, others being exclusive. These categories of jurisdiction—later enlarged—were largely for the benefit of plaintiffs. There was concern that the rivalries, jealousies, and animosities among the States made necessary and appropriate the creation of a dual system of courts.

Lack of trust in some of the state courts for execution of federal laws was reflected in the First Congress that established the dual system. Thus Madison said:

"... a review of the constitution of the courts in many States will satisfy us that they cannot be trusted with the execution of the Federal laws. In some of the States, it is true, they might, and would be safe and proper organs of such a jurisdiction; but in others they are so dependent on State Legislatures, that to make the Federal laws dependent on them, would throw us back into all the embarrass-

ments which characterized our former situation. In Connecticut the Judges are appointed annually by the Legislature, and the Legislature is itself the last resort in civil cases." 1 Ann. Cong. 813.

Though federal question jurisdiction was originally limited to a few classes of cases, the creation of diversity jurisdiction (§ 11, 1 Stat. 78) was a significant manifestation of this same feeling. As Chief Justice Marshall said in *Bank of United States* v. *Deveaux,* 5 Cranch 61, 87:

> "The judicial department was introduced into the American constitution under impressions, and with views, which are too apparent not to be perceived by all. However true the fact may be, that the tribunals of the states will administer justice as impartially as those of the nation, to parties of every description, it is not less true that the constitution itself either entertains apprehensions on this subject, or views with such indulgence the possible fears and apprehensions of suitors, that it has established national tribunals for the decision of controversies between aliens and a citizen, or between citizens of different states."

And see *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 347.

The alternative—the one India took—was to let the state courts be the arbiters of federal as well as state rights with ultimate review in the Federal Supreme Court. But the federal court system was the choice we made and those courts have functioned throughout our history. In the years since 1789, the jurisdiction of the federal courts where federal rights are in issue has been steadily expanded (see Hart & Wechsler, The Federal Courts and the Federal System 727–733 (1953)), particularly with the creation of a general "federal question" jurisdiction in 1875. 18 Stat. 470.

While the federal courts were for the most part cus-
todians of rights asserted by plaintiffs, from the very
beginning they were also the haven of a restricted group
of defendants as well. I refer to § 12 of the Judiciary
Act of 1789, 1 Stat. 79, which permitted removal of
cases from a state court to a federal court on the ground
of diversity of citizenship. Thus from the very start we
have had a removal jurisdiction for the protection of
defendants on a partial parity with federal jurisdiction
for protection of plaintiffs.

The power of a defendant to remove cases from a state
court to a federal court was not greatly enlarged until
passage of the first Civil Rights Act,[1] § 3 of which
provided:

> ". . . the district courts of the United States,
> within their respective districts, shall have, exclu-
> sively of the courts of the several States, cognizance
> of all crimes and offences committed against the
> provisions of this act, and also, concurrently with
> the circuit courts of the United States, of all causes,
> civil and criminal, affecting persons *who are denied
> or cannot enforce in the courts or judicial tribunals
> of the State or locality where they may be* any of
> the rights secured to them by the first section of this
> act; and if any suit or prosecution, civil or criminal,

---

[1] Act of April 9, 1866, 14 Stat. 27. There were a handful of
other removal statutes passed in the interim. See, *e. g.*, Act of
February 4, 1815, § 8, 3 Stat. 198 (removal of civil and criminal
actions against federal customs officers for official acts); Act of
March 2, 1833, § 3, 4 Stat. 633 (removal of civil and criminal actions
against federal officers on account of acts done under the revenue
laws), see *Tennessee* v. *Davis*, 100 U. S. 257; Act of March 3, 1863,
§ 5, 12 Stat. 756 (removal of civil and criminal actions against
federal officers—civil or military—for acts done during the existence
of the Civil War under color of federal authority).

has been or shall be commenced in any State court, against any such person, for any cause whatsoever . . . such defendant shall have the right to remove such cause for trial to the proper district or circuit court in the manner prescribed by the 'Act relating to habeas corpus and regulating judicial proceedings in certain cases,' approved March three, eighteen hundred and sixty-three, and all acts amendatory thereof. . . ." (Emphasis added.)

With the coming of the Civil War it became plain that some state courts might be instruments for the destruction through harassment of guaranteed federal civil rights. We have seen this demonstrated in the flow of cases coming this way. But the minorities who are the subject of repression are not only those who espouse the cause of racial equality. Jehovah's Witnesses in many parts of the country have likewise felt the brunt of majoritarian control through state criminal administration. Before them were the labor union organizers. Before them were the Orientals. It is in this setting that the removal jurisdiction must be considered.

The removal laws passed from time to time have responded to two main concerns: First, a federal fact-finding forum is often indispensable to the effective enforcement of those guarantees against local action.[2]

---

[2] Madison, whose views on the establishment of the federal court system prevailed, said in the debates:

"[U]nless inferior tribunals were dispersed throughout the republic . . . appeals would be multiplied to a most oppressive degree; that, besides, an appeal would not in many cases be a remedy. What was to be done after improper verdicts, in state tribunals, obtained under the biased directions of a dependent judge, or the local prejudices of an undirected jury? To remand the cause for a new trial would answer no purpose. . . . An effective judiciary establishment, commensurate to the legislative authority, was essential. A government without a proper executive and judiciary would

The federal guarantee turns ordinarily upon contested issues of fact. Those rights, therefore, will be of only academic value in many areas of the country unless the facts are objectively found. Secondly, swift enforcement of the federal right is imperative if the guarantees are to survive and not be slowly strangled by long, drawn-out, costly, cumbersome proceedings which the Congress feared might result in some state courts. The delays of state criminal process, the perilous vicissitudes of litigation in the state courts, the onerous burdens on the poor and the indigent who usually espouse unpopular causes—these threaten to engulf the federal guarantees. It is in that light that 28 U. S. C. § 1443 (1) should be read and construed.

## II.

The critical words, so far as the present cases are concerned, are "denied or cannot enforce in the courts or judicial tribunals" of the State or locality where they may be those rights which, in the most recent version of the removal statute,[3] are characterized as those secured

---

be the mere trunk of a body, without arms or legs to act or move." 5 Elliot's Debates 159 (1876).

His victory "destroyed the ability of the states to sabotage the Union through their judiciary systems." 3 Brant, James Madison 42 (1950). Cf. *England* v. *Medical Examiners*, 375 U. S. 411, 416–417.

[3] 28 U. S. C. § 1443 (1964 ed.) provides:

"Any of the following civil actions or criminal prosecutions, commenced in a State court may be removed by the defendant to the district court of the United States for the district and division embracing the place wherein it is pending:

"(1) Against any person who is denied or cannot enforce in the courts of such State a right under any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof;

"(2) For any act under color of authority derived from any law providing for equal rights, or for refusing to do any act on the ground that it would be inconsistent with such law."

by "any law providing for the equal civil rights of citizens of the United States, or of all persons within the jurisdiction thereof." [4]

It is difficult to discern whether the Court ascribes different meanings to the words "is denied" and "cannot enforce" as used in the statute. In my view, it is essential that these two aspects of § 1443 (1) be distinguished. The words "is denied" refer to a *present* deprivation of rights while the language "cannot enforce" has reference to an *anticipated* state court frustration of equal civil rights. *Virginia* v. *Rives*, 100 U. S. 313, and subsequent decisions of this Court which the majority discusses, were concerned with claims of the "cannot enforce" variety. [5]

_____

[4] Whatever the full reach of the statutory language "any law providing for the equal civil rights of citizens," the wrongs of which these defendants and those in *Georgia* v. *Rachel, ante,* p. 780, complain (with the possible exception of pure First Amendment claims) are well within its coverage. See, *e. g.,* 42 U. S. C. §§ 1971, 1973i (b) (1964 ed. & Supp. I) (statutes adopted under Congress' power to assure equal access to the vote to all citizens, regardless of "race, color, or previous condition of servitude," U. S. Const., Amendment XV); 42 U. S. C. § 1981 (1964 ed.) (guaranteeing all persons the right not to be subjected to "punishment, pains, penalties . . . [or] exactions" not suffered in like circumstances by "white citizens"); 42 U. S. C. §§ 2000a, 2000a–2 (1964 ed.) (discussed in *Georgia* v. *Rachel, supra*). I doubt that any meaningful distinction could be drawn for removal purposes between, for example, rights secured by 42 U. S. C. § 1981 and those guaranteed by the Equal Protection Clause, which largely reiterated § 1981 in constitutional terms. But it is unnecessary, on my view of these cases, to settle this question. I therefore do not reach the highly questionable propositions relied upon by the majority in restricting the scope of the rights which § 1443 (1) encompasses.

[5] Strictly speaking, the Court in *Virginia* v. *Rives, supra,* drew no distinction between the "is denied" and the "cannot enforce" clauses. It is clear, if only in retrospect, that the Court was there concerned solely with a claim of an *anticipated* inability to enforce equal civil rights because of the state court's tolerance of the exclusion of Negroes from the jury. The Court held that pretrial removal

The Court dealt, in those cases, with the issue of unequal administration of justice in the process of jury selection. The concern was that removal might be permitted on merely a speculation that the state court would not, *in the future,* discharge its obligation to follow the "law of the land." Whatever the correctness of those decisions as to the "cannot enforce" clause, they have no application whatever to a claim of a present denial of equal civil rights.

## A.

A defendant "is denied" his federal right when "disorderly conduct" statutes, "breach of the peace" ordinances, and the like are used as the instrument to suppress his promotion of civil rights. We know that such laws are sometimes used as a club against civil rights workers.[6] Senator Dodd who was the floor manager for that part of the Civil Rights Act of 1964 which restored the right of appeal from an order remanding a removed case (§ 901, 78 Stat. 266, 28 U. S. C. § 1447 (d) (1964 ed.)) stated:[7]

> "I think cases to be tried in State courts in communities where there is a pervasive hostility to civil rights, and cases involving efforts to use the court process as a means of intimidation, ought to be removable under this section."

The examples are numerous. First is the case of prosecution under a law which is valid on its face but

could not reach "a judicial [as opposed to a legislative] infraction of the constitutional inhibitions, after trial or final hearing has commenced." 100 U. S., at 319. Fairly read, *Rives* applies only to claims for removal arising under the "cannot enforce" clause of § 1443 (1).

[6] See, *e. g., Edwards* v. *South Carolina,* 372 U. S. 229; *Henry* v. *City of Rock Hill,* 376 U. S. 776 (*per curiam*); *Cox* v. *Louisiana,* 379 U. S. 536; *Shuttlesworth* v. *Birmingham,* 382 U. S. 87.

[7] 110 Cong. Rec. 6955 (1964).

applied discriminatorily.[8] Second is a prosecution under, say, a trespass law for conduct which is privileged under federal law.[9] Third is an unwarranted charge brought against a civil rights worker to intimidate him for asserting those rights,[10] or to suppress or discourage their promotion. The present charges are initiated by prosecutors for the purpose, defendants allege, of deterring or punishing the exercise of equal civil rights. The Court of Appeals said:

". . . we do not read these cases [*Rives* and *Powers*] as establishing that the denial of equal civil rights must appear on the face of the state constitution or statute rather than in its application where the alleged *denial of rights, as here, had its inception in the arrest and charge.* They dealt only with the systematic exclusion question, a question which in turn goes to the very heart of the state judicial process, and federalism may have indicated that the remedy in such situations in the first instance should be left to the state courts. We would not expand the teaching of these cases to include state denials

---

[8] Administration of a law which appears fair on its face violates the Equal Protection Clause if done in a way which is racially discriminatory (*Yick Wo* v. *Hopkins*, 118 U. S. 356) or which prefers the proponents of certain ideas over others (*Niemotko* v. *Maryland*, 340 U. S. 268, 272; *Cox* v. *Louisiana, supra*, at 553–558; and see *id.*, at 580–581 (BLACK, J., concurring)). Both standards combine in the case of discriminatory enforcement directed against civil rights demonstrators. And see 42 U. S. C. § 1981 (1964 ed.).

[9] See, *e. g.*, *Hamm* v. *City of Rock Hill*, 379 U. S. 306, 310; *Georgia* v. *Rachel, ante.*

[10] Cf. authorities cited, note 8, *supra.* Various federal statutes make it a crime to interfere with or punish the exercise of federally protected rights. See, *e. g.*, § 11 (b) of the Voting Rights Act of 1965, 79 Stat. 443, 42 U. S. C. § 1973i (b) (1964 ed., Supp. I); § 203 of the Civil Rights Act of 1964, 78 Stat. 244, 42 U. S. C. § 2000a–2 (1964 ed.). See *infra*, at 847–848 and note 12.

of equal civil rights through the unconstitutional application of a statute in situations which are not a part of the state judicial system but which, on the contrary, arise in the administration of a statute in the arresting and charging process." 347 F. 2d 679, 684. (Emphasis added.)

I agree with that conclusion.

There are two ways which § 1443 (1) may be read, either of which leads to the conclusion that these cases are covered by the "is denied" clause. As Judge Sobeloff said, dissenting in *Baines* v. *City of Danville*, 357 F. 2d 756, 778, the clause in question may be paraphrased in either of the following ways:

"Removal is permissible by:

"(i) any person who is denied [,] or cannot enforce [,] in the courts of such State a right under any law . . . .

"or

"(ii) any person who is denied [,] or cannot enforce in the courts of such State [,] a right under any law . . . ."

If the latter construction is taken, a right "is denied" by state action at any time—before, as well as during, a trial. I agree with Judge Sobeloff that this reading of the provisions is more in keeping with the spirit of 1866, for the remedies given were broad and sweeping:

"If a Negro's rights were denied by the actions of such state officer, the aggrieved party was permitted to have vindication in the federal court; either by filing an original claim or, if a prosecution had already been commenced against him, by removing the case to the federal forum." *Id.*, at 781.

Yet even if the "is denied" clause is read more restrictively, the present cases constitute denials of federal civil

rights "in the courts" of the offending State within the meaning of § 1443 (1), for the local judicial machinery is implicated even prior to actual trial by issuance of a warrant or summons; by commitment of the prisoner, or by accepting and filing the information or indictment. Initiation of an unwarranted judicial proceeding to suppress or punish the assertion of federal civil rights makes out a case of civil rights "denied" within the meaning of § 1443 (1). Prosecution for a federally protected act is punishment for that act. The cost of proceeding court by court until the federal right is vindicated is great. Restraint of liberty may be present; the need to post bonds may be present; the hire of a lawyer may be considerable; the gantlet of state court proceedings may entail destruction of a federal right through unsympathetic and adverse fact-findings that are in effect unreviewable. The presence of an unresolved criminal charge may hang over the head of a defendant for years.

In early 1964, for example, the Supreme Court of Mississippi affirmed convictions in harassment prosecutions arising out of the May 1961 Freedom Rides. See *Thomas* v. *State,* 252 Miss. 527, 160 So. 2d 657; *Farmer* v. *State,* 161 So. 2d 159; *Knight* v. *State,* 248 Miss. 850, 161 So. 2d 521. More than another year was to pass before this Court reached and reversed those convictions.[11] *Thomas* v. *Mississippi,* 380 U. S. 524 (1965).

Continuance of an illegal local prosecution, like the initiation of a new one, can have a chilling effect on a federal guarantee of civil rights. We said in *NAACP* v. *Button,* 371 U. S. 415, 433, respecting some of these fed-

---

[11] And see *Edwards* v. *South Carolina,* 372 U. S. 229 (1963) (nearly two years from arrest to our reversal of convictions); *Fields* v. *South Carolina,* 375 U. S. 44 (1963) (three and a half years from arrest to our reversal of convictions); *Henry* v. *City of Rock Hill,* 376 U. S. 776 (1964) (more than four years from arrest to our reversal of convictions).

eral rights, that "[t]he threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." In a First Amendment context, we said: "By permitting determination of the invalidity of these statutes without regard to the permissibility of some regulation on the facts of particular cases, we have, in effect, avoided making vindication of freedom of expression await the outcome of protracted litigation. Moreover, we have not thought that the improbability of successful prosecution makes the case different. The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." *Dombrowski* v. *Pfister*, 380 U. S. 479, 487. The latter case was a suit to enjoin a state prosecution. The present cases are close kin. For removal, if allowed, is equivalent to a plea in bar granted by a federal court to protect a federal right.

The threshold question—whether initiation of the state prosecution has "denied" a federal right—is resolvable by the federal court on a hearing on the motion to remove. As noted, it is in substance a plea in bar to the prosecution, a plea grounded on federal law. If the motion is granted, the removed case is concluded at that stage, as a case of misuse of a state prosecution has been made out. Cf. *O'Campo* v. *Hardisty*, 262 F. 2d 621; *De Busk* v. *Harvin*, 212 F. 2d 143. In other words, the result of removal is not the transfer of the trial from the state to the federal courts in this type of case. If after hearing it does not appear that the state prosecution is being used to deny federal rights, the case is remanded for trial in the state courts. 28 U. S. C. § 1447 (c) (1964 ed.). But the removal statute meanwhile serves a protective function. Filing of the petition removes the case and auto-

matically stays further proceedings in the state court. 28 U. S. C. § 1446 (e) (1964 ed.). Moreover, if the defendant is confined, the removal judge must, without awaiting a hearing, issue a writ to transfer the prisoner to federal custody, 28 U. S. C. § 1446 (f) (1964 ed.), and he may then enlarge him on bail.

The Court holds in *Rachel* that a hearing must be held as to whether, in the particular case, the trespass prosecution constitutes a denial of equal civil rights. Inexplicably, no such hearing is to be held in the present cases. For reasons not clear, a baseless prosecution, designed to punish and deter the exercise of such federally protected rights as voting, is not seen by the majority to constitute a denial of equal civil rights. This seems to me to overlook two very important federal statutes. The first, 42 U. S. C. § 1981 (1964 ed.) (the present version of § 1 of the Civil Rights Act of 1866 to which the original removal statute referred), provides:

> "All persons within the jurisdiction of the United States shall have the same right in every State . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

The other, § 11 (b) of the Voting Rights Act of 1965, 79 Stat. 443, 42 U. S. C. § 1973i (b) (1964 ed., Supp. I), provides:

> "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or . . . urging or aiding any person to vote or attempt to vote . . . ."

Those sections make clear beyond debate that, if the defendants' allegations are true, these state prosecutions themselves constitute a denial of "a right under any law providing for the equal civil rights of citizens." [12]

## B.

Defendants also allege that they "cannot enforce" in the courts of Greenwood, the locality in which their cases are to be tried, their equal civil rights. This, unlike a claim of present denial of rights, rests on prediction of the future performance of the state courts; as such, it admittedly falls within the *Rives-Powers* doctrine.

---

[12] Compare the language of § 203 of the Civil Rights Act of 1964, 78 Stat. 244, 42 U. S. C. § 2000a–2 (1964 ed.), relied upon by the Court in *Rachel* as creating a right to be free from a wrongful prosecution: "No person shall . . . (b) intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person with the purpose of interfering with any right or privilege secured by [the public accommodations sections], or (c) punish or attempt to punish any person for exercising or attempting to exercise any right or privilege secured by [the public accommodations sections]."

The majority appears to distinguish this case from *Rachel* on the ground that in the latter case, the defendants were "authorized" by the Civil Rights Act of 1964 to enter a restaurant and receive equal accommodation. In my judgment, that is a distinction without substance for purposes of § 1443 (1). A person "is denied" rights which § 1443 (1) protects when the very prosecution of him is in violation of a federal statute assuring equal civil rights. That is true whether the act for which he is being prosecuted is specifically authorized by statute or, rather, is merely one of the innumerable acts which members of the community daily perform without either statutory authorization or police interference.

It must be apparent that the action by the Revisers of 1874 in eliminating the previous provision for post-trial removal is irrelevant to interpretation of the "is denied" clause. Even on the majority's own interpretation of the statute, where *"any* proceedings in the courts of the State will constitute a denial" of rights secured by a federal statute assuring equal civil rights, an appropriate basis will have been shown for a "firm prediction" of such denial. *Georgia* v. *Rachel, ante,* at 804.

I agree with the majority that, in providing for appeal of remand orders in civil rights removal cases, Congress meant for us to reconsider that line of cases.[13] Unlike the majority, however, I believe that those cases, to the extent that they limit removal to instances where the inability to enforce equal civil rights springs from a state statute or constitutional provision compelling the forbidden discrimination, should not be followed.[14] That construction of § 1443 (1) resulted, I think, from a misreading of the removal provisions of the Act of 1866.

---

[13] The irrationality of the *Rives-Powers* requirement that removal be predicated on a facially unconstitutional statute was known to Congress when it amended the law to make possible appeal from an order remanding the case to the state court. As then-Senator Humphrey, floor manager of the Civil Rights Act of 1964, put it: "[T]he real problem at present is not a statute which is on its face unconstitutional; it is the unconstitutional application of a statute. When a State statute has been unconstitutionally applied, most Federal district judges presently believe themselves bound by these old decisions . . . . *Enactment of [the appeal provision] will give the appellate courts an opportunity to reexamine this question.*" 110 Cong. Rec. 6551 (1964). (Emphasis added.) Similar invitations to overrule the *Rives-Powers* line of cases were uttered by Senator Dodd (110 Cong. Rec. 6955–6956) and Congressman Kastenmeier (110 Cong. Rec. 2770) and it is fair to assume that Congress did not reinstate the right to appeal from a remand order merely to allow civil rights litigants the brutal luxury of an appeal, the inevitable outcome of which would be an affirmance.

[14] The majority's view of the *Rives-Powers* doctrine is none too clear. In *Rachel,* it dispenses with the broad statement of that doctrine that there be a facially unconstitutional state statute or constitutional provision, for it permits removal on a showing that a state statute is unconstitutional only in application to those seeking relief. The Court explains this by reliance on language in *Rives* which the Court thought warranted the conclusion that in certain circumstances, removal might be justified even in the absence of a discriminatory state statute. In this case, however, the majority appears to adopt the whole sweep of the *Rives-Powers* doctrine, and makes the absence of facially unconstitutional state action fatal to the petition for removal.

I think that the words "cannot enforce" should be construed in the spirit of 1866. Senator Lane speaking for the first Civil Rights Act said: [15]

> "The State courts already have jurisdiction of every single question that we propose to give to the courts of the United States. Why then the necessity of passing the law? Simply because we fear the execution of these laws if left to the State courts. That is the necessity for this provision."

Senator Trumbull, who was the Chairman of the Judiciary Committee and who managed the bill on the floor, many times reflected the same view. He stated that the person discriminated against "should have authority to go into the Federal courts in all cases where a custom prevails in a State, or where there is a statute-law of the State discriminating against him." Cong. Globe, 39th Cong., 1st Sess., 1759.

It was not the existence of a statute, he said, any more than the existence of a custom discriminating against the person that would authorize removal, but whether, in either case, it was probable that the state court would fail adequately to enforce the federal guarantees. *Ibid.*

The Black Codes were not the only target of this law. Vagrancy laws were another—laws fair on their face which were enforced so as to reduce free men to slaves "in punishment of crimes of the slightest magnitude" (*Id.,* at 1123), laws which declare men "vagrants because they have no homes and because they have no employment" in order "to retain them still in a state of real servitude." *Id.,* at 1151.

In my view, § 1443 (1) requires the federal court to decide whether the defendant's allegation (that the state court will not fairly enforce his equal rights) is true.[16]

---

[15] Cong. Globe, 39th Cong., 1st Sess., 602.

[16] In support of its contrary result, the Court cites the number of removal petitions filed in the year 1965. I am unaware of any

If the defendant is unable to demonstrate this inability to enforce his rights, the case is remanded to the state court. But if the federal court is persuaded that the state court indeed will not make a good-faith effort to apply the paramount federal law pertaining to "equal civil rights," then the federal court must accept the removal and try the case on the merits.

Such removal under the "cannot enforce" clause would occur only in the unusual case. The courts of the States generally try conscientiously to apply the law of the land. To be sure, state court judges have on occasion taken a different view of the law than that which this Court ultimately announced. But these honest differences of opinion are not the sort of recalcitrance which the "cannot enforce" clause contemplates. What Congress feared was the exceptional situation. It realized that considerable damage could be done by even a single court which harbored such hostility toward federally protected civil rights as to render it unable to meet its responsibilities. The "cannot enforce" clause is directed to that rare case.

Execution of the legislative mandate calls for particular sensitivity on the part of federal district judges; but the delicacy of the task surely does not warrant a

relevance this figure has in the interpretation of a statute enacted in 1866. Indeed, if any contemporary incidents are to provide guidance, I should think we would be aided by the debates and votes in Congress on the Civil Rights Act of 1964. Opponents of the provision allowing appeals from a remand order warned of possible dilatory tactics and disruptions of the judicial processes—state and federal—which might result; this was virtually the only expressed basis of opposition to this proposed amendment. See, e. g., H. R. Rep. No. 914, 88th Cong., 1st Sess., 59, 67, 111–112 (minority reports); 110 Cong. Rec. 2769–2784 (passim) (House); id., at 13468, 13879 (Senate). Proposals to delete the appeal provision were decisively rejected, 118–76 in the House (id., at 2784) and in the Senate on two occasions, 51–31 (id., at 13468) and 66–25 (id., at 13879).

refusal to attempt it. I am confident that the federal district judges would exercise care and good judgment in passing on "cannot enforce" claims. A district judge could not lightly assume that the state court would shirk its responsibilities, and should remand the case to the state court unless it appeared by clear and convincing evidence that the allegations of an inability to enforce equal civil rights were true. Cf. Amsterdam, Criminal Prosecutions Affecting Federally Guaranteed Civil Rights: Federal Removal and Habeas Corpus Jurisdiction to Abort State Court Trial, 113 U. Pa. L. Rev. 793, 854–863, 911–912 (1965). A requirement that defendants seeking removal demonstrate a basis for "firm prediction" of inability to enforce equal civil rights in the state court is the only necessary consequence of the revision of 1874 which silently deleted the provision for post-trial removal from the statute. In this way, the legitimate interests of federalism which *Rives* sought to protect would be respected without emasculating this statute.

### III.

The Court takes considerable comfort from the availability to defendants of numerous other federal remedies, such as direct review in this Court, federal habeas corpus, civil actions under 42 U. S. C. § 1983 (1964 ed.), and even federal criminal prosecutions. But it is relevant to note when these alternative remedies were conferred. The extension of the habeas corpus remedy to state prisoners was enacted in 1867 by the Thirty-ninth Congress, the same body which enacted the removal statute we here consider. 14 Stat. 385. The criminal statutes involved in our recent decisions in *United States* v. *Price,* 383 U. S. 787, and *United States* v. *Guest,* 383 U. S. 745, were first enacted in 1866 and 1870. 14 Stat. 27; 16 Stat. 141, 144. The civil remedy provided by 42 U. S. C. § 1983 was enacted in 1871. 17 Stat. 13. If any inference is to be

drawn from the existence of these coordinate remedies, it is that Congress was concerned, at the time this removal statute was passed, to protect from state court denial the equal civil rights of United States citizens. Rather than take comfort from the broad array of possible remedies, we should take instruction from it.

Moreover, the Court's many rhetorical questions respecting implementation of removal, if it were allowed, are answered in *Tennessee* v. *Davis,* 100 U. S. 257, 271–272, a case decided the same day as *Rives:*

> "The imaginary difficulties and incongruities supposed to be in the way of trying in the Circuit Court an indictment for an alleged offence against the peace and dignity of a State, if they were real, would be for the consideration of Congress. But they are unreal. While it is true there is neither in sect. 643, nor in the act of which it is a re-enactment, any mode of procedure in the trial of a removed case prescribed, except that it is ordered [that] the cause when removed shall proceed as a cause originally commenced in that court, yet the mode of trial is sufficiently obvious. The circuit courts of the United States have all the appliances which are needed for the trial of any criminal case. They adopt and apply the laws of the State in civil cases, and there is no more difficulty in administering the State's criminal law. They are not foreign courts. The Constitution has made them courts within the States to administer the laws of the States in certain cases; and, so long as they keep within the jurisdiction assigned to them, their general powers are adequate to the trial of any case. The supposed anomaly of prosecuting offenders against the peace and dignity of a State, in tribunals of the general government, *grows entirely out of the division of powers between that government and the govern-*

*ment of a State; that .is, a division of sovereignty over certain matters. When this is understood (and it is time it should be), it will not appear strange that, even in cases of criminal prosecutions for alleged offences against a State, in which arises a defence under United States law, the general government should take cognizance of the case and try it in its own courts, according to its own forms of proceeding."* (Emphasis added.)

## IV.

The federal court in a removal case plainly must act with restraint. But to deny relief in the cases now before us is, in view of the allegations made, to aggravate a wrong by compelling these defendants to suffer the risk of an unwarranted trial and by allowing them to be held under improper charges and in prison, if the State desires, for an extended period pending trial. The risk that the state courts will not promptly dismiss the prosecutions was the congressional fear. The Court defeats that purpose by giving a narrow, cramped meaning to § 1443 (1). These defendants' federal civil rights may, of course, ultimately be vindicated if they persevere, live long enough, and have the patience and the funds to carry their cases for some years through the state courts to this Court. But it was precisely that burden that Congress undertook to take off the backs of this persecuted minority and all who espouse the cause of their equality.